**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| TIMOTHY MOXLEY, RYAN CALLAHAN, JOHN JACKSON, JR., JAMES CARROLL, JEFFREY ROHDE, PATRICK MURRAY, and JOHN DOES 78-100, | |
| Plaintiffs, | Case No. 21 Civ. 3838 |
| v. | |
| THE OHIO STATE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**COMPLAINT**

Plaintiffs Timothy Moxley, Ryan Callahan, John Jackson, Jr., James Carroll, Jeffrey Rohde, Patrick Murray, and John Does 78-100,[1] by and through their counsel, state the following as their Complaint against Defendant, The Ohio State University:

**PRELIMINARY STATEMENT AND INTRODUCTION**

1.      The Ohio State University ("OSU" or "University") let a monster sexually abuse hundreds, perhaps thousands, of young men for two decades. OSU employed this monster. OSU gave him a position of authority. OSU promoted him. OSU even honored him. OSU let him perpetrate, at last count, "1,429 instances of fondling and 47 instances of rape."[2] This is perhaps the greatest sex abuse scandal in American history. It is without question the greatest scandal in the history of American higher education.

2.      This civil rights case is brought by 29 of the men sexually assaulted, abused,

---

[1] John Does 78-100 are plaintiffs, represented by the same counsel, in a related case, *Snyder-Hill, et al. v. The Ohio State University*, Case No. 2:18-cv-00736.

[2] *University issues annual crime report*, Ohio State News (Oct. 1, 2019), https://news.osu.edu/university-issues-annual-crime-report/.

molested and/or harassed by Dr. Richard Strauss, the physician, athletic team doctor, and serial sex abuser OSU employed from 1978 to 1998.

3.      That Dr. Strauss abused Plaintiffs and hundreds of other young men at OSU is not open to reasonable debate: He committed 1,429 sexual assaults and 47 rapes by OSU's admission. An OSU-commissioned investigative report found that Dr. Strauss "sexually abused at least 177 male student-patients he was charged with treating as a University physician."[3] Report at 1. Dr. Strauss' sexual abuse of OSU students included fondling their testicles and penises, masturbating men to erection and ejaculation, drugging and anally raping them, digitally penetrating their rectums, touching their bodies in other inappropriate ways, making inappropriate comments about their bodies, and asking improper, sexualized questions—all in the guise of providing needed medical evaluation and care.

4.      Equally undebatable is OSU's knowledge, deliberate indifference, and culpability.

5.      From the beginning, OSU knew Dr. Strauss was abusing male students: "University personnel had knowledge of Strauss' sexually abusive treatment of male student-patients as early as 1979." *Id.* at 1. As Governor Mike DeWine's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss ("Medical Board Report") found, "Despite multiple supervising and colleague physicians who were aware of complaints/rumors about Strauss as far back as 1979, no Ohio State University physician reported any wrongdoing by Strauss to the State Medical Board of Ohio. More troubling, it appears the abuse was never reported to law enforcement by anyone at the University or the

---

[3] Caryn Trombino & Markus Funk, Perkins Coie LLP, *Report of the Independent Investigation: Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University* (May 15, 2019) [hereinafter "Report"].

Medical Board."[4] Medical Board Report at 2.

6.  "Despite the persistence, seriousness, and regularity of such complaints [from male students], no meaningful action was taken by the University to investigate or address the concerns until January 1996." Report at 3. For decades, Dr. Strauss' abuse was well known among at least *fifty* OSU employees in the athletic department. *Id.* at 88, 100-22. Multiple Student Health Directors were also told about Dr. Strauss' abuse for years, as were OSU's counsel and multiple senior administrators in Student Affairs (including Vice Presidents Mary Daniels and David Williams). *Id.* at 115-44. Dr. Strauss' inappropriate touching was a frequent topic of discussion and well known among OSU's trainers, coaches, and athletic directors. This was reflected in the commonly-used nicknames for Dr. Strauss, including "Dr. Balls," "Dr. Nuts," "Dr. Jelly Paws," "Dr. Soft Hands," and "Dr. Cough."

7.  Instead of stopping Dr. Strauss' serial sexual abuse, OSU facilitated it. OSU employed Dr. Strauss for nearly two decades. OSU put Dr. Strauss in Student Health Services, exposing thousands of students to him. OSU made Dr. Strauss the official doctor for no fewer than five sports teams and gave him regular access to student-athletes in at least 16 sports. OSU forced student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships—even after student-athletes complained to their coaches about Dr. Strauss' abuse. At least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

8.  There was an "astounding failure of anyone in a position of authority to come forward to initiate a Medical Board or criminal investigation into Strauss' conduct." Medical

---

[4] *Report of the Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss* (Aug. 30, 2019), https://med.ohio.gov/Portals/0/Gov%20Working%20Group%20Strauss%20Report.pdf?ver=2019-09-30-142900-270 [hereinafter "Medical Board Report"].

Board Report at 2. "Strauss' repeated sexual abuse of his patients went effectively unaddressed for nearly the length of his tenure at Ohio State. Although many were aware of complaints or rumors about the abuse, no one advanced concerns raised by students or unraveled Strauss' 'medical' defenses of his abuse." *Id*. at 1.

9.      According to Dr. Ted Grace, the director of OSU Student Health Services, the decision not to report Strauss' sexual abuse to the Medical Board was made by OSU administrators.

10.      Not one OSU administrator or employee contacted the police. No one called 911. No one contacted the State Medical Board. No one contacted a prosecutor or district attorney. No one fulfilled their duties as a mandated reporter of sexual abuse. This was a complete and utter collapse of OSU's duty to protect its students.

11.      OSU administrators and employees of Student Health Services facilitated Dr. Strauss' abuse in yet other ways. For example, after a student lodged a complaint detailing Dr. Strauss' inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse by telling the student (falsely) that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate. The Director of Student Health also failed to report Dr. Strauss to law enforcement or to the State Medical Board, despite being required to do so.

12.      Plaintiffs, and many other young men, would have been spared Dr. Strauss' horrific abuse had the University investigated and terminated Dr. Strauss when the complaints began.

13.      Yet "[d]espite the persistence, seriousness, and regularity of such complaints"— from 1979 to 1996—"no meaningful action was taken by the University to investigate or address

the concerns until January 1996." Report at 3.

14.     When OSU belatedly took action in 1996, it did far too little. Although OSU removed Dr. Strauss as a treating physician in that year, it did little else. "[N]one of the physicians working with Strauss found occasion to report him to the Medical Board or to law enforcement – even after the University suspended him from seeing patients through Student Health. Nor did the University or any of its administrators involve campus or outside law enforcement, even after recognizing that the severity and pervasiveness of Strauss' abuse compelled the withdrawal of authority to see patients and the nonrenewal of his contract." Medical Board Report at 3.

15.     Not only did OSU not report Dr. Strauss, it concealed his abuse and enabled him to continue seeing patients.

16.     OSU continued Dr. Strauss' faculty appointment even after OSU determined that Dr. Strauss' misconduct required removing him as a treating physician, and even after the State Medical Board had "brought to the attention of officials at the university" "that Dr. Strauss ha[d] been performing inappropriate genital exams on male students for years." *Id*. OSU allowed Dr. Strauss to retire voluntarily in 1998. When Dr. Strauss retired, OSU gave him emeritus status. OSU also allowed Dr. Strauss to open an off-campus men's clinic in 1996, advertise for patients in OSU's student newspaper in 1996 and 1997, and even offer a student discount—enabling Dr. Strauss' continued abuse of young men in Columbus. Report at 5, 85.

17.     OSU's investigation in 1996 also never sought to identify, counsel, or support Dr. Strauss' victims. Even after the Medical Board told OSU in 1996 that Dr. Strauss had been "performing inappropriate genital exams on male students" at OSU "for years," OSU did nothing to identify those whom Dr. Strauss abused. *Id.* at 4. Sworn testimony by OSU doctors from both

Student Health and the Athletics Department confirms that OSU failed to take "additional steps to identify other students who had previously complained about Strauss," even as OSU falsely claimed to the Medical Board that it was working to do so. *Id*. Had OSU made any effort to identify others Dr. Strauss had abused, it would have had no difficulty identifying scores of male students. OSU's concealment of Dr. Strauss' pervasive sexual abuse meant that those students needlessly suffered for decades, alone.

18.     Even after it knew that Dr. Strauss had been "performing inappropriate genital exams on male students" at OSU "for years," Medical Board Report at 3, OSU destroyed patient health records of those examined by Dr. Strauss—as sworn testimony has confirmed. Those records would have helped identify whom Dr. Strauss abused. Those records would have substantiated survivors' complaints about Dr. Strauss' unnecessary medical exams. By destroying those health records, OSU further concealed Dr. Strauss' sexual abuse.

19.     OSU's culture of institutional indifference to the rights and safety of its students has permitted serial sexual predators and harassers to thrive at the university for the last four decades. OSU has not only been indifferent to the abuse inflicted by Dr. Strauss but on information and belief, at least two OSU employees since Dr. Strauss systematically committed sexual abuse and/or facilitated rampant sexual harassment: a former Director of OSU's Marching Band, Jonathan Waters, and an assistant diving coach, Will Bohonyi.

20.     In 2014, after OSU investigated a complaint against Jonathan Waters alleging a sexualized culture within the Marching Band, OSU found "a sexually hostile environment for students in the Marching Band of which the University had notice and failed to adequately address."[5]

---

[5] Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University 2 (Sept. 11, 2014),

21. In response to its findings of sexual harassment within the Marching Band, OSU adopted a new plan for combatting sexual misconduct so that it could become "a national leader" in preventing and responding to sexual misconduct.[6]

22. But OSU is an offender, not a "national leader." After receiving a report during a meet in 2014 that assistant diving coach Will Bohonyi sexually abused a minor in OSU's Diving Club, OSU allegedly sent the victim, not Bohonyi, home from the meet.[7] In addition, OSU allegedly failed to address hundreds of naked photographs Bohonyi forced a 16-year-old victim to take of herself and that were in OSU's possession for approximately four years.[8]

23. In 2018, OSU dissolved its comprehensive sexual assault prevention and response unit after revelations that OSU employees within the unit had failed to handle students' reports of sexual assault properly and told some victims that they were "lying" and "delusional."[9] An independent audit found that the unit failed to report *57* potential felonies to law enforcement.[10]

---

https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf [hereinafter "OCR Findings Letter"] (describing results of OSU's investigation of alleged sexual harassment within Marching Band).

[6] The Ohio State University, *Ohio State announces comprehensive plan to combat sexual misconduct and relationship violence*, Ohio State News (Sept. 17, 2015), https://news.osu.edu/ohio-state-announces-comprehensive-plan- to-combat-sexual-misconduct-and-relationship-violence/ [hereinafter "OSU Plan"].

[7] *See* Complaint at ¶¶ 267-75, *Pryor v. USA Diving, Inc., et al.*, No. 1:18-cv-2113 (S.D. Ind. July 11 2018), ECF No. 1, https://www.courtlistener.com/recap/gov.uscourts.insd.85736/gov.uscourts.insd.85736.1.0_2.pdf [hereinafter "Diving Complaint"].

[8] *Id.* at ¶¶ 176-80, 260-61.

[9] Jennifer Smola, *Ohio State closes 'failed' program, takes another hard look at Title IX policies*, The Columbus Dispatch (June 24, 2018 6:29 PM), http://www.dispatch.com/news/20180624/ohio-state-closes-failed-program-takes-another-hard-look-at-title-ix-policies; *see also* Jeremy Bauer-Wolf, *A broken system at Ohio State*, Inside Higher Ed (July 10, 2018), https://www.insidehighered.com/news/2018/07/10/ohio- state-closes-sexual-assault-unit-after-complaints-mismanagement-poor-reporting.

[10] Jennifer Smola, *Ohio State's troubled sexual assault center failed to report 57 potential*

24.     It is not surprising that, within this ingrained culture of institutional indifference, OSU succeeded in keeping Dr. Strauss' two decades of serial sexual abuse buried until 2018.

25.     OSU has admitted the University's "fundamental failure at the time to prevent this abuse."[11] Plaintiffs have filed this lawsuit in the hope that OSU will fulfill its goal of becoming "a national leader" in preventing and responding to sexual misconduct by making the systemic changes needed to ensure that students can obtain their education in a safe environment, free from sexual harassment and abuse by OSU employees. Plaintiffs also seek compensation for their injuries caused by OSU's failure to take appropriate action to stop Dr. Strauss' known sexual predation, in violation of Title IX of the Education Amendments of 1972.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States. Specifically, Plaintiffs assert claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

28.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

29.     Because this Complaint addresses issues of sexual harassment and abuse, which

---

*felonies, audit finds*, The Columbus Dispatch (July 30, 2019 7:12 AM), https://www.dispatch.com/news/20190730/ohio-states-troubled-sexual-assault-center-failed-to-report-57-potential-felonies-audit-finds.

[11] *See* Michael V. Drake, *A Message from President Drake: Strauss Investigation Report*, The Ohio State University (May 17, 2019), https://president.osu.edu/presidents/drake/news-and-notes/2019/strauss-investigation-report-campus-wide-email.html.

are matters of the utmost intimacy, with the exception of certain Plaintiffs who have agreed to be publicly identified, the names of the Plaintiffs have been withheld from the public version of the Complaint to protect their identities.[12]

30.    Plaintiff Timothy Moxley is an adult male and a resident of Florida. He attended OSU from 1985 to 1989. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during at least three physical exams and at least eight medical appointments at OSU from 1985 to 1987, and at least two to four times in 1984 when Moxley, as a minor, was wrestling for his high school team at the Ohio high school wrestling tournament at St. John Arena on OSU's campus.

31.    Plaintiff Ryan Callahan is an adult male and a resident of Ohio. He attended OSU from 1995 to 1997. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss multiple times during at least two physical exams and two medical appointments from 1995 to 1996 at OSU.

32.    Plaintiff John Jackson, Jr., is an adult male and a resident of Ohio. He attended The Ohio State University from 1985 to 1987 and from 2009 to 2011. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an annual examination while attending OSU.

33.    Plaintiff James Carroll is an adult male and a resident of Ohio. He attended The Ohio State University from 1984 to 1986 and 1996 to 1999. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during a medical examination while attending OSU.

34.    Plaintiff Jeffrey Rohde is an adult male and a resident of Ohio. He attended The Ohio State University from 1986 to 1990. He was sexually assaulted, abused, molested and/or

---

[12] Plaintiffs will file under seal a version of the Complaint that identifies each of the John Doe plaintiffs to this Court.

harassed by Dr. Strauss during an annual examination while attending OSU.

35.     Plaintiff Patrick Murray is an adult male and a resident of Ohio. He attended The Ohio State University from 1983 to 1984, 1988 to 1990, and 1992 to 1995. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during a medical examination while attending OSU.

36.     Plaintiff John Doe 78 is an adult male and a resident of Ohio. He attended The Ohio State University beginning in 1991 until ultimately graduating in 2000. He was a member of OSU's baseball team from 1991 through 1994. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations while attending OSU.

37.     Plaintiff John Doe 79 is an adult male and a resident of Florida. He attended The Ohio State University from 1984 to 1989. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss multiple times during medical examinations while attending OSU.

38.     Plaintiff John Doe 80 is an adult male and a resident of New York. He attended The Ohio State University from 1995 to 1996. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss three times during physical and medical examinations while attending OSU.

39.     Plaintiff John Doe 81 is an adult male and a resident of Ohio. He attended The Ohio State University from 1988 to 1993. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss two times during medical examinations while attending OSU.

40.     Plaintiff John Doe 82 is an adult male and a resident of Ohio. He attended The Ohio State University from 1986 to 1990. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an annual examination while attending OSU.

41.     Plaintiff John Doe 83 is an adult male and a resident of Maryland. He attended The Ohio State University from 1989 to 1993. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations while attending OSU.

42.     Plaintiff John Doe 84 is an adult male and a resident of Ohio. He attended OSU from 1988 to 1997. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss at two physical examinations from 1988 to 1989.

43.     Plaintiff John Doe 85 is an adult male and a resident of Texas. He attended The Ohio State University from 1985 to 1991. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss four times during medical examinations while attending OSU.

44.     Plaintiff John Doe 86 is an adult male and a resident of Texas. He attended The Ohio State University from 1988 through 1994. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations while attending OSU.

45.     Plaintiff John Doe 87 is an adult male and a resident of Ohio. He attended The Ohio State University from 1982 through 1988. John Doe 87 was sexually assaulted, abused, molested and/or harassed by Dr. Strauss six times during annual and other examinations while attending OSU.

46.     Plaintiff John Doe 88 is an adult male and a resident of Ohio. He attended The Ohio State University from 1992 through 1997. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations while attending OSU.

47.     Plaintiff John Doe 89 is an adult male and a resident of Florida. He attended OSU

from 1987 to 1992. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during at least five physical exams and one medical appointment from 1987 to 1992.

48.     Plaintiff John Doe 90 is an adult male and a resident of Florida. He attended OSU from 1985 to 1990. He was sexually assaulted, abused, molested and/or harassed on one occasion by Dr. Strauss at OSU in 1987.

49.     Plaintiff John Doe 91 is an adult male and a resident of Ohio. He attended OSU from 1991 through 1996. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss on four occasions during physical exams and on at least one occasion during a medical appointment from 1991 through 1994.

50.     Plaintiff John Doe 92 is an adult male and a resident of Ohio. He attended The Ohio State University from 1988 through 1993. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during four annual physical examinations while attending OSU.

51.     Plaintiff John Doe 93 is an adult male and a resident of Ohio. He attended OSU from 1988 to 1995. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during one physical exam at OSU in 1988.

52.     Plaintiff John Doe 94 is an adult male and a resident of Ohio. He attended OSU from 1988 to 1991. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during at least two physical exams and two medical appointments from 1988 to 1991.

53.     Plaintiff John Doe 95 is an adult male and a resident of Ohio. He attended OSU from 1985 to 1988. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during three annual physical exams and fifty to seventy other medical visits from 1985 to 1988.

54.     Plaintiff John Doe 96 is an adult male and a resident of Virginia. He attended OSU from 1985 to 1987. He was sexually assaulted, abused, molested and/or harassed by Dr.

Strauss during at least three physical exams and nine medical appointments from 1985 to 1987.

55.    Plaintiff John Doe 97 is an adult male and a resident of Utah. He attended OSU from 1982 to 1987. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during at least three medical appointments in the winter of 1983 to 1984.

56.    Plaintiff John Doe 98 is an adult male and a resident of Ohio. He attended The Ohio State University from 1995 to 2000. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations while attending OSU.

57.    Plaintiff John Doe 99 is an adult male and a resident of Ohio. He attended The Ohio State University from 1995 to 1996. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during two medical examinations while attending OSU.

58.    Plaintiff John Doe 100 is an adult male and a resident of Ohio. He attended The Ohio State University from 1988 through 1995. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during medical examinations while attending OSU.

59.    Defendant The Ohio State University ("OSU") was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

60.    Defendant OSU receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

## COMMON FACTUAL ALLEGATIONS

61.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

### Dr. Strauss' History of Employment and Sexual Predation at OSU

62.     OSU employed Dr. Strauss from approximately September 1978 through March 1998. Dr. Strauss served in various positions at OSU, including, but not limited to: assistant professor of medicine, tenured associate professor, and full professor; associate director of the Sports Medicine Program; physician in the Sports Medicine Clinic in OSU's Student Health Services; treating physician at OSU's Student Health Services; and team physician for at least five OSU sports teams.

63.     Dr. Strauss was appointed to the OSU faculty as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine on September 1, 1978. OSU promoted him to tenured Associate Professor in July 1983, and, in July 1992, OSU promoted him again from Associate Professor to Professor. He remained an OSU faculty member until he retired on March 1, 1998. While on the OSU faculty he had concurrent responsibilities in other OSU roles.

64.     "Within months" of his September 1978 appointment, Dr. Strauss "began serving as a team physician to OSU student-athletes on an informal, volunteer basis. By October 1980, Strauss was appointed Associate Director of Sports Medicine in the Department of Preventive Medicine (unpaid), at which point he was spending approximately 20% of his time practicing clinical sports medicine with OSU varsity athletes at the Sports Medicine Clinic in Student Health, and worked daily in the late afternoon at the Larkins Hall training room." Report at 34.

65.     Dr. Bob Murphy, the Head Team Physician, "requested that the Athletics Director (Hugh Hindman) formally appoint Strauss as a team physician" in August 1981. *Id.*

66.     Dr. Strauss served as a team physician until July 1996.

67.     As a team physician, Dr. Strauss had regular contact with male student-athletes in

baseball, cheerleading, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, diving, water polo, tennis, track and field, cross country, volleyball, wrestling, and golf.

68.     Dr. Strauss also worked as a physician at OSU's Student Health Center, where he had access to the entire student population, not just student-athletes. According to the OSU-commissioned report, "Strauss provided medical treatment to students in the Student Health Center from roughly 1980 through early 1996, primarily in conjunction with the Sports Medicine Clinic and his role as a team physician." *Id*. at 36. Dr. Strauss was formally appointed as a Student Health staff physician in the Men's Clinic in July 1994. *Id.*

69.     In January 1996, OSU placed Dr. Strauss on administrative leave and conducted an investigation. The investigation was based on sexual misconduct complaints from three students (one of whom was Steve Snyder-Hill, a plaintiff in a related action against OSU) that OSU had received between November 1994 and January 1996. In June 1996, OSU held a disciplinary hearing into these complaints without notifying the student complainants or permitting them to participate. *See id*. at 4, 145.

70.     In August 1996, OSU declined to renew Dr. Strauss' appointment with Student Health. OSU's Student Health Services did not renew his contract and the Athletic Department terminated his employment agreement with the Athletics Department. *Id.* at 3-4. OSU, however, kept Dr. Strauss as a tenured faculty member and, after he voluntarily retired in 1998, OSU gave him emeritus status. *Id.* at 154.

71.     Beginning his very first year of employment at OSU—and spanning his entire two-decade tenure—Dr. Strauss preyed on male students, voyeuring, fondling, groping, sexually assaulting, abusing, harassing, and raping them. He did so with OSU's knowledge and support.

72.     OSU facilitated Dr. Strauss' abuse of male student-athletes by requiring them to

undergo annual physical exams with Dr. Strauss in order to participate in OSU athletics and maintain their scholarships. OSU also facilitated Dr. Strauss' abuse of male students in the general student population by making Dr. Strauss a treating physician at OSU's Student Health Center. OSU also facilitated Dr. Strauss' abuse of those who worked at OSU during athletic events.

73. OSU also facilitated Dr. Strauss' abuse of underage boys, including underage boys who participated in OSU athletics, in OSU's summer sports camps for high school students and underage boys who visited OSU, by providing Dr. Strauss free access to underage boys with no supervision or oversight.

74. No matter the illness or injury, Dr. Strauss' modus operandi during medical exams was always similar.

75. He required students to remove their pants so that he could perform invasive and medically unnecessary examinations of their genitals and/or rectum.

76. He groped and fondled students' genitalia, often without gloves.

77. He performed unnecessary rectal examinations and digitally penetrated students' anuses.

78. He pressed his erect penis against students' bodies.

79. He drugged and anally raped students.

80. He moaned while performing testicular exams.

81. He masturbated during or after the exams.

82. He made inappropriate and medically unnecessary comments about students' bodies, including comments on their physical appearance, heritage, skin tone, and physique. And he took pictures of students, purportedly for a musculature book he was writing.

83.     During Dr. Strauss' first year of employment, when an attending physician at OSU's Student Health Center asked a wrestling team captain, David Mulvin, why he came to the Student Health Center instead of seeing Dr. Strauss, the wrestler explained that Dr. Strauss had examined his genitals for 20 minutes and appeared to be trying to get him excited.[13]

84.     Another student-athlete's experience exemplifies the pattern of Dr. Strauss' sexual predation. The student recalled a physical exam with Dr. Strauss: "I'm sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen." Dr. Strauss then told the athlete to undress so that he could check, purportedly, for a hernia. Dr. Strauss proceeded to inspect the student's penis "in detail."[14]

85.     The next year, the student-athlete received his physical, yet again, from Dr. Strauss. Most of the 20-minute exam involved Dr. Strauss inspecting the student's genitalia.[15]

86.     The following year, the student-athlete received his physical from a different doctor. That physical lasted five minutes. There was no hernia test. The doctor did not make the student fully undress. Afterward, the student was perplexed: "Is that it?"[16]

87.     The student-athlete was confused by Dr. Strauss' behavior. But Dr. Strauss' authority as a medical professional and OSU's official team doctor caused the student to doubt his instincts. And Dr. Strauss' elevated position at OSU made him feel powerless to stop it.

88.     Only after OSU publicly announced in 2018 that it was investigating allegations

---

[13] Jean Casarez, *Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation*, CNN (July 19, 2018), https://www.cnn.com/2018/07/18/us/former-osu-wrestler-richard-strauss-molestation-allegation/index.html.

[14] Kevin Stankiewicz, *Former Ohio State athlete says he was sexually assaulted twice by former team doctor Richard Strauss*, The Lantern (Apr. 6, 2018), https://www.thelantern.com/2018/04/former-ohio-state-athlete-says-he-was-sexually-assaulted-twice-by-former-team-doctor-richard-strauss/.

[15] *Id.*

[16] *Id.*

of sexual misconduct raised against Dr. Strauss (the "Investigation") did the student realize that his discomfort had been justified, his instincts correct: Dr. Strauss had sexually abused him. He was relieved to learn that he wasn't "crazy" for thinking something had been wrong.[17]

## **Most OSU Students Did Not Know They Were Sexually Abused**

89.     The insidious nature of sexual abuse by a healthcare provider explains the Plaintiffs' struggle to come to terms with Dr. Strauss' abuse—and why this struggle is all too common among victims of physician-patient abuse. Most of Dr. Strauss' victims did not realize these exams were sexually abusive until after OSU publicized its Investigation in 2018.

90.     As the OSU-commissioned Report concedes, "[t]his case present[s] an intersection of two specific types of sexual abuse, both of which have generally *not* been associated with common conceptions of sexual abuse. Specifically, this case involve[s] doctor-patient sexual abuse and the sexual abuse of adult males." *Id*. at 11 (emphasis in original).

91.     The Report also acknowledges that "[p]atients often do not report sexual abuse committed by their doctors due to . . . confusion as to whether sexual abuse, in fact, occurred." *Id*. Even as late as 2018/2019, 22 of the 177 students interviewed for the OSU-commissioned investigation *still* did not understand Strauss' conduct constituted abuse, though the Report found they were abused. *Id.* at 38.

92.     Multiple OSU witnesses, including former OSU doctors, have already conceded in sworn testimony that students could not have known Dr. Strauss was abusing them. They admit that patients do not know what is a "normal exam" because patients have a "lack of information" about what is medically appropriate, that it is normal for patients to be naked in front of doctors and for doctors to touch them, that "doctors are in a position of superior

---

[17] *Id*.

knowledge and authority" to patients, and that patients including OSU students trusted their doctor to do what was medically appropriate. For example, when a doctor tells a patient with a sore throat that he needs to check the lymph nodes in the patient's genitals, the patient trusts the doctor's experience and medical training; he trusts that it is medically appropriate to touch his genitals.

93.     Because laypersons can find it difficult to ascertain what conduct constitutes physician sexual abuse, Perkins Coie LLP—the law firm that prepared the OSU-commissioned Report—determined that it was "essential" to its investigation that it "consult with suitably qualified medical experts." Those external experts were essential to "discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary." *Id*. at 24.

94.     As Dr. Grace testified:

> Q.     Because this investigative team, a bunch of lawyers at a law firm, they're not going to know what's medically appropriate or what's not medically appropriate, correct?
> A.     Yes.
> Q.     They need to consult medical experts to make that determination?
> A.     Yes.

95.     Dr. John Lombardo the Head Team Physician/Medical Director of the OSU Sports Medicine and Family Health Center, confirmed: "I don't think the attorneys know what's appropriate"—"medically appropriate"—because they are not "trained in medicine." OSU students are similarly not trained in medicine and did not know what was medically appropriate.

96.     A law firm with millions of dollars and experienced investigators could not determine whether patients were abused, without consulting "suitably qualified medical experts." It is little wonder that so many Plaintiffs, most of whom were just college-aged men, did not

know either.

### OSU's Knowledge and Facilitation of Dr. Strauss' Sexual Predation

97.     OSU played a key role in normalizing and perpetuating Dr. Strauss' serial sexual abuse.

98.     For instance, when Steve Snyder-Hill, a former OSU student sexually assaulted by Dr. Strauss, lodged a complaint about Dr. Strauss' misconduct, the director of OSU's Student Health Services, Dr. Grace, told him—falsely—that OSU had "never received a complaint about Dr. Strauss before."[18]

99.     In fact, OSU had received many complaints about Dr. Strauss before.

100.    OSU learned of the abuse within Dr. Strauss' very first year of employment. During the 1978-1979 wrestling season, Dr. Strauss fondled David Mulvin, a wrestling team captain, during a medical exam. Mulvin reported the incident to a doctor at OSU's Student Health Center.[19]

101.    The doctor did nothing.[20]

102.    OSU did nothing.[21]

103.    The abuse was well known within the athletics community at OSU. Strauss' inappropriate sexual behavior was "broadly witnessed and discussed in the Athletics Department." *Id.* at 88. Perkins Coie found that "[m]ore than *50* individuals who were members

---

[18] Jennifer Smola, *Complaint from former Ohio State student details abuse by Strauss in 1995*, The Columbus Dispatch (July 19, 2018, 4:10 PM), http://www.dispatch.com/news/20180719/complaint-from-former-ohio-state-student-details-abuse-by-strauss-in-1995.

[19] Jean Casarez, *Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation*, CNN (July 19, 2018), https://www.cnn.com/2018/07/18/us/former-osu-wrestler-richard-strauss-molestation-allegation/index.html.

[20] *See id.*

[21] *See id.*

of the OSU Athletics Department staff" knew about Dr. Strauss' inappropriate sexual conduct. *Id*. (emphasis added).

104.     Student complaints about Dr. Strauss poured in over the years. Male student after male student complained: "From roughly 1979 to 1996, male students complained that Strauss routinely performed excessive—and seemingly medically unnecessary—genital exams, regardless of the medical condition the student-patients presented." *Id*. at 2-3.

105.     It was also "broadly known within the Athletic Department that Strauss showered alongside the male students." *Id*. at 2.

106.     "[B]eing examined by Strauss was akin to being 'hazed' or was a 'rite of passage.'" *Id*. at 88.

107.     Older students told younger students to watch out for Dr. Strauss, giving him nicknames such as Dr. Jelly Paws, Dr. Nuts, Dr. Cough, and Dr. Levi's (because he would tell the student to remove or pull down his jeans to access the student's genitalia).

108.     Student-athletes informed OSU athletic administrators and staff, including, but not limited to, Athletic Director Andy Geiger, Athletic Director Jim Jones, Athletic Director Hugh Hindman, Assistant Athletic Director Archie Griffin, Senior Associate Athletic Director Paul Krebs, Assistant Athletic Director Larry Romanoff, Assistant Athletic Director Richard Delaney, Assistant Director of Student Athlete Support Services John Macko, Track and Field Coach Frank Zubovich, Tennis Coach John Daly, Swimming Coach Dick Sloan, Head Wrestling Coach Chris Ford, Head Gymnastics Coach Peter Kormann, Head Lacrosse Coach Paul Caldwell, Head Cheerleading Coach Sherri Moore, Head Football Coach Earle Bruce, and Fencing Coach Charlotte Remenyik, that Dr. Strauss' conduct seemed inappropriate and made them uncomfortable.

109. Other than Remenyik, these administrators did not take any action in response to the athletes' complaints about Dr. Strauss.

110. Staff at OSU's Student Health Center—including multiple Student Health Directors—were also aware of serious concerns about Dr. Strauss' examinations of male students.

111. A 1982 draft report by the primary physician in the Student Health Center's Sports Medicine Clinic, Dr. David Henderson, stated that "[Dr. Strauss] works for no one, answers to no one, and is accountable to no one." *Id.* at 116. Dr. Henderson's concerns, though admittedly oblique, were serious enough to be escalated to Dr. Bob Murphy, the Head Team Physician and Director of OSU's Sports Medicine Division, and to University President Edward Jennings. Dr. Forrest Smith—who served as acting director of Student Health from 1990 to 1991 and assistant medical director beginning in 1992—admitted that though Dr. Strauss was nominally under his "command," Dr. Smith "didn't control him."

112. In fact, Dr. Murphy received at *least five* written reports about Dr. Strauss' misconduct—four from OSU Athletics Department staff and one from a student-athlete: (i) Assistant Athletic Director Larry Romanoff told Dr. Murphy in the late 1980s or early 1990s that there were rumors that Strauss was showering with the student-athletes; (ii) after a student announced to the training room in 1989 that Dr. Strauss administrated an inappropriate genital exam, an athletic trainer reported the student's complaint to Dr. Murphy; (iii) in 1992 or 1993, Dr. Murphy asked a Team Physician to perform the wrestling team's annual physical instead of Dr. Strauss due to "issues" about how Dr. Strauss performed genital exams and his continued presence in the showers; (iv) a student trainer reported concerns about Strauss' examination methods to Dr. Murphy, apparently in 1979 or 1980; and (v) a student-athlete complained to Dr.

Murphy that Dr. Strauss fondled his penis for an extended time during a routine annual physical. *Id*. at 100–02.

113.     There is no documentation or information that Dr. Murphy did anything in response to any of the five complaints.

114.     Instead, Dr. Murphy advised Dr. Strauss in approximately 1986 that there were persistent rumors about him. *Id*. at 95. Still, Dr. Murphy did not take action on student-athletes' complaints.

115.     Dr. Lombardo testified that Dr. Murphy also knew that Strauss showered with athletes and maintained a locker at Larkins Hall. Dr. Murphy knew athletes were uncomfortable that Dr. Strauss showered naked with them. Yet Dr. Murphy did not want to confront Dr. Strauss.

116.     In the winter of 1992 or spring of 1993, according to Dr. Lombardo's sworn testimony, Dr. Murphy informed Dr. Lombardo that Dr. Strauss was showering with athletes in communal showers with eight or more men potentially showering at the same time. Dr. Murphy instructed Lombardo to "take care of this." At that point, Dr. Murphy was Strauss' supervisor; Dr. Lombardo was not.

117.     Dr. Lombardo testified that he had a single conversation with Dr. Strauss. He claims he told him that it was "inappropriate" for him to be showering with students in communal showers and directed him to stop. Other than that single conversation, Dr. Lombardo took no further action. He admitted that he never spoke to the athletes, never spoke to the coaches, never conducted an investigation, and never reported the athletes' concerns.

118.     Dr. Lombardo admitted he never verified if Dr. Strauss did, in fact, stop showering with athletes after their single conversation. Dr. Strauss did not stop. Dr. Strauss

continued to shower with athletes after winter 1992/spring 1993, as numerous athletes have reported.

119. Dr. John Lombardo also received and discarded other complaints about Dr. Strauss. An athletic trainer told Dr. Lombardo in the early 1990s that Dr. Strauss made athletes uncomfortable and it was inappropriate for him to shower with students. A Graduate Assistant Trainer reported to Dr. Lombardo her "concerns about the rumors regarding Strauss" performing seemingly unnecessary genital exams and the fact that Strauss insisted on one-on-one exams with the students." *Id*. at 103.

120. One nurse reported to Perkins Coie that Dr. Strauss' examinations of male student-patients were so much "longer than normal" that Student Health staff speculated "that Strauss was engaged in 'sexual interaction' with the male student-patients." *Id.* at 121. In that time period, she also reported to two Student Health Directors (Dr. Doris Charles and Dr. Forrest Smith) that Strauss took longer than normal to conduct his examinations with student-patients and raised concerns that "Strauss would bring students in without scheduling any appointments and would not create any records from the visit." *Id.* Both directors dismissed her concerns, though excessively long exams and unscheduled and unrecorded visits are a red flag for inappropriate conduct. *Id*. at 121-22. Dr. Grace, the Student Health Director at OSU beginning in 1992, knew before he even joined OSU that Dr. Strauss was rumored to have engaged in "inappropriate sexual touching of athletes." *Id.* at 141. Dr. Grace admitted that he came to OSU "suspicious" of Dr. Strauss and was "surprised" to learn Dr. Strauss was assigned to Student Health. *Id.* Nonetheless, Dr. Grace allowed Dr. Strauss to staff the Student Health Men's Clinic. Dr. Grace testified that he did not look into the "rumor" he heard about an OSU doctor sexually touching athletes: "that's not the type of person I am. I just don't engage."

121.   Dr. Grace further testified that Dr. Forrest Smith never told him about the nurse's complaint about Dr. Strauss—which he admitted was a "pretty large failure."

122.   Dr. Grace admitted that he knew that Dr. Strauss' practice was to do a genital exam on every male patient:

> Q.   In fact, Dr. Strauss is the one and only doctor you had, according to you, who did this full body inspection for every complaint, right?
> A.   Correct.
>
> Q.   That's highly unusual medical practice, right?
> A.   It's unusual.
>
> Q.   Someone comes in with a, you know, bloody nose, you're not supposed to check the genitals, right?
> A.   Correct.

123.   Dr. Grace ignored this red flag. As Dr. Smith confirmed:

> Q.   Okay. If you learned as a physician during your tenure at OSU that another doctor was doing a complete genital exam for a person that came in and complained of a sore elbow, would that be appropriate?
> A.   No.
>
> Q.   Would that be a red flag?
> A.   Yeah.
>
> Q.   That'd be something that's worthy of investigation; correct?
> A.   Big time.

124.   Dr. Grace claimed to require Dr. Strauss to "call for a chaperone every time he was going to conduct a genital examination on a student in the Men's Clinic." *Id.* at 142. But "it is unclear why Grace believed that a 'self-enforcing' chaperoning requirement was an appropriate solution for Strauss, given that virtually every examination in the Men's Clinic was likely to require a genital examination, due to the nature of the services offered there." *Id.* at 143-144. In any event, Dr. Strauss stopped calling the chaperone, and Dr. Grace "never checked in

with [the assigned chaperone] to determine whether Strauss was complying with the requirement, or to solicit [the chaperone's] views on how the examinations were proceeding." *Id.* at 142.

125.    No later than 1994, Remenyik, the head coach for fencing, reported that male fencers were uncomfortable with Dr. Strauss and she complained that Dr. Strauss was "performing improper or unnecessary genital exams on her male student-athletes." *Id.* at 92-93. Dr. John Lombardo, OSU's Medical Director/Head Team Physician, recognized Remenyik's concerns in a November 1994 letter to Senior Associate Athletic Director Paul Krebs. Dr. Lombardo's letter stated he "investigated" Remenyik's concerns, and concluded they were "based on rumors" that had been "generated for 10 years with no foundation." *Id.* at 93. He described the "rumors" as "pervasive." *Id.* at 94.

126.    OSU then had another physician—Dr. Trent Sickles—"assume the primary role as physician for the fencers." *Id.* But still Dr. Strauss continued to serve as the team doctor for other sports. Dr. Lombardo he did not even *ask* the coaches or student athletes for those sports whether they had any concerns about Dr. Strauss.

127.    According to Dr. Sickles' sworn testimony, no one ever told him *why* he was replacing Dr. Strauss as the fencers' team doctor. Dr. Sickles was kept in the dark about Remenyik's concerns, the student-athletes' concerns about Dr. Strauss showering with them, or the complaints about Dr. Strauss that Dr. Lombardo received from trainers. Dr. Lombardo and Dr. Murphy deliberately withheld that information to protect Dr. Strauss.

128.    Dr. Lombardo claimed that Remenyik's concerns were merely rumors, even though—according to his own testimony— Remenyik raised her concerns *after* Dr. Lombardo knew that Dr. Strauss was showering with student athletes.

129.     But OSU did nothing to protect all of the other athletes and students who were being abused by Dr. Strauss. OSU did not do a formal investigation or take any disciplinary action against Dr. Strauss. OSU did not report the complaint to the State Medical Board of Ohio. OSU imposed a culture of silence: according to sworn testimony, complaints about Dr. Strauss in the Athletics Department could not be shared with Student Health—and vice versa. The Athletics Department received complaint after complaint, removed Dr. Strauss from treating the fencers, warned him not to shower with student athletes—yet never told anyone at Student Health about these glaring red flags. Likewise (as detailed further below), Student Health suggested (but did not require) a chaperone and received formal complaints that were so serious that Student Affairs administrators were involved—yet no one at OSU told Dr. Strauss' supervisors at the Athletics Department that they had any concerns about Dr. Strauss.

130.     Multiple OSU doctors testified that, while Dr. Strauss worked at OSU, OSU had no policies or procedures to address, investigate, or report allegations of sexual assault.

131.     OSU did not provide its employees with any training on sexual assault.

132.     Dr. Strauss' unorthodox touching during medical exams was such common knowledge that OSU's coaching staff, trainers, and student-athletes knew him as "Dr. Jelly Paws," "Dr. Nuts," "Dr. Soft Hands," and "Dr. Cough"—names that reflect his sexual predation.

133.     OSU's coaching staff, including tennis coach John Daly, regularly joked about Dr. Strauss' examinations of male athletes. Daly threatened student-athletes that they would have to see Dr. Strauss if they did not do what the coach asked. He also laughed about it being a student's "turn to see Dr. Strauss."

134.     Dr. Strauss' inappropriate examinations were well known and discussed openly by OSU administrators and staff.

135.    Rather than take the flood of complaints about Dr. Strauss seriously, OSU continued to require students to be treated by him, thereby supplying him an endless trough of victims.

136.    Indeed, OSU told student-athletes that if they wanted to keep their scholarships or continue playing for OSU, they had to go to Dr. Strauss for their annual physical exams and medical treatment.

137.    Many of Dr. Strauss' victims were student-athletes on full scholarship, making them particularly vulnerable to his abuse. OSU's requirement that athletes be examined and treated by Dr. Strauss forced them into an impossible Hobson's choice: either suffer through Dr. Strauss' deeply uncomfortable, questionable examinations or forego their scholarships and educations.

138.    OSU's requirement also put student-athletes in the unbearable position of choosing between their physical health in the short term and their psychological, emotional, and physical well-being in the long-term.

139.    For instance, one student-athlete—an All-American wrestler—recalled that whenever he was injured, he had to decide: "Is this injury bad enough that I'm going to get molested for it?"[22]

140.    Dr. Strauss' abuse—which OSU allowed to continue unchecked throughout his long tenure—has traumatized many survivors for decades. Indeed, many survivors continue to be afraid to see doctors to this day, causing them to jeopardize their health and receive dangerous diagnoses late.

---

[22] Kantele Franko, *Ex-athletes say Ohio State doc groped, ogled men for years*, AP News (July 7, 2018), available at https://www.apnews.com/355629efdd91432aadfca6d6b28c170c (last visited Oct. 23, 2019).

141. Dr. Strauss did not limit his abuse to the privacy of the exam room. He reigned over the locker rooms of Larkins Hall, the former OSU recreation center, where—in full view of OSU's coaching staff and other employees—he harassed male student-athletes.

142. He read the newspaper naked in the male locker room, so that he could stare at student-athletes' bodies.

143. He showered with student-athletes for hours at a time and several times a day.

144. On one occasion, he finished showering and was preparing to leave the locker room when one of his "favorite" wrestlers began to shower. Dr. Strauss undressed and joined the wrestler in the shower.[23]

145. Yet again, male student-athletes complained to OSU about Dr. Strauss' conduct.

146. Yet again, OSU had an opportunity to stop the abuse, but did nothing.

147. And so, Dr. Strauss continued to terrorize OSU students with impunity.

148. Following Dr. Strauss' lead, other OSU employees took full advantage of OSU's indifference to sexual harassment and abuse.

149. For instance, some trainers were so "touchy feely" with the student-athletes that the athletes developed a practice of informing each other about which trainers to avoid.

150. A cohort of "voyeurs" flocked to Larkins Hall to gawk at the OSU student-athletes and masturbate while watching them shower.[24]

151. One wrestling head coach, Russ Hellickson, described the toxic culture at OSU as

---

[23] *See* First Amended Class Action Complaint at ¶ 135, *John Doe, et al. v. The Ohio State University*, No. 2:18-cv-00692 (S.D. Ohio Oct. 26, 2018), ECF No. 33 [hereinafter "Class Action Complaint"]), ¶ 135.

[24] Rachael Bade & John Bresnahan, *'A cesspool of deviancy': New claims of voyeurism test Jordan denials*, POLITICO (July 6, 2018), available at https://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192 (last visited July 26, 2018).

a "cesspool of deviancy."[25] He recalled, "Coaching my athletes in Larkins Hall was one of the most difficult things I ever did."[26]

152.    At times, Coach Hellickson had to physically drag the voyeurs out of Larkins Hall.[27] Although he pleaded with OSU to move the athletes to a private building,[28] his pleas went unheard. Yet again, OSU did nothing to stop the abuse and harassment.

153.    Though students and OSU staff complained about Dr. Strauss for decades, it was not until 1996 that the complaints led to a formal investigation.

154.    Shortly after Dr. Lombardo's November 1994 finding that the fencing team's complaints were "unfounded," two male patients of the Student Health Men's Clinic—Snyder-Hill ("Student B" in the Perkins Coie Report) and another student ("Student A" in the Perkins Coie Report)—separately complained about Dr. Strauss' inappropriate genital exams in January 1995.

155.    Dr. Grace, then Director of Student Health, wrote a report stating he had created a consent form as a result of Student A's complaint.

156.    Snyder-Hill reported to Student Health that, Dr. Strauss, among other things, pressed his erect penis against him during his medical examination.

157.    After Snyder-Hill complained about Dr. Strauss' inappropriate exams (detailed further below), and shortly after Student A's complaint, Dr. Grace falsely claimed that Student Health had never received a complaint about Dr. Strauss and claimed all complaints were maintained in a quality assurance file. He also falsely claimed that, as a result of Snyder-Hill's

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

complaint, Student Health was creating a consent form, but apparently Dr. Grace was already creating this form as a result of Student A's complaint.

158.    Despite the two complaints brought against Strauss in January 1995, neither Dr. Grace nor anyone at Student Health or at OSU took any meaningful action to stop this sexual predator. No one at OSU called police, 911, or the Medical Board. No one took any disciplinary action. No one informed students or the public. No one informed anyone in the Athletics Department, where Strauss was still the team doctor for a number of teams. No one did any meaningful investigation, for example inquiring whether any other student or patient had been sexually abused. No one made any serious attempt to monitor Strauss with other students or patients. Dr. Grace never even thought to observe one of Strauss' examinations. No one followed up with Strauss to see if he was doing appropriate examinations.

159.    To this day, Dr. Grace insists he did the right thing in not reporting Dr. Strauss to law enforcement.

160.    However, Dr. Grace regularly informed Vice President of Student Affairs Mary Daniels about Dr. Strauss' sexual abuse in their weekly meetings.

161.    Dr. Sickles testified that an OSU doctor should have reported this conduct to the Medical Board:

> Q.    And would you report that to the Medical Board?
> A.    Yes.
>
> Q.    And you'd do that immediately?
> A.    Yes.
>
> Q.    And any doctor in Ohio should have known that, right?
> A.    Yes.
>
> Q.    Back in the seventies, the eighties and the nineties, right?
> A.    Yes.

Q.    And any doctor who failed to do that failed their obligations, right?

A.    Yes.

Q.    And so is there any excuse for a medical doctor at Ohio State University, learning about a patient who had Dr. Strauss press his erect penis against him in January 1995, is there any excuse for that doctor not reporting that to the Medical Board any time in 1995? It's pretty outrageous, isn't it?

A.    It sounds outrageous to me, yes.

162.    To the contrary, not only did no one report Dr. Strauss in 1995, OSU gave Dr. Strauss "Exceptional" and "Excellent" ratings on his 1995 OSU Administrative & Professional Staff Performance.

163.    Why would OSU give a known sexual predator an exceptional performance evaluation? In a June 1996 memo to OSU's counsel and to OSU administrator David Williams (who reported directly to the OSU's President), Dr. Grace explained: "For legal reasons, we would never mention a serious allegation against a physician on their evaluation form, which was a permanent part of their personnel record."

164.    As Dr. Grace testified, it was "the policy in student health that you would not mention a serious allegation, such as sexual misconduct, in an evaluation form."

165.    The reason, Dr. Grace admits, was to cover up the abuse, prevent the public (including OSU students) from learning about the abuse, and protect the doctor, in this case, Dr. Strauss. Personnel evaluations, Dr. Grace noted, were potentially accessible via a public records request.

166.    Not only did Dr. Grace hide Dr. Strauss' abuse from the public, Dr. Miller—Dr. Strauss' direct supervisor who performed the 1995 performance evaluation—testified that Dr. Grace intentionally "kept him in the dark" about students' complaints about Dr. Strauss' abuse.

According to Dr. Miller, Dr. Grace had never told him that students had complained about inappropriate sexual conduct and he would not have provided the exemplary performance review had he known.

167.    Dr. Strauss never received a bad performance review at Student Health and no sexual abuse allegation was ever mentioned.

168.    A year later, in January 1996, a third student complained that Dr. Strauss fondled his genitals and asked him sexually inappropriate questions.

169.    Finally, after years of complaints, this cluster of complaints caused OSU to place Dr. Strauss on administrative leave in January 1996 and launch a Student Affairs investigation into the November 1994 complaints from the fencing team, the two January 1995 complaints, and the January 1996 complaint. As part of its investigation, OSU apparently did not investigate the history of complaints about Strauss in the Athletics Department. *Id.* at 147-48.

170.    Still, no one at OSU reported Dr. Strauss to the Medical Board.

171.    To the contrary, in April 1996, *Dr. Strauss* filed a complaint against Dr. Grace with the Medical Board.

172.    While investigating Dr. Strauss' complaint, the Medical Board on its own learned of sexual abuse complaints against Strauss, and self-initiated an investigation into Strauss.

173.    The Medical Board then interviewed Dr. Grace, who admitted that "there are many male athletes that have been abused by Dr. Strauss."

174.    Dr. Grace later testified that, by "many," he meant: "three, four, five, six. Whatever."

175.    On March 13, 2020, Dr. Grace was deposed by special outside counsel for the Medical Board in relation to the Medical Board's investigation into his failure to report Dr.

Strauss' abuse. Dr. Grace testified that prior to his arrival at OSU he had heard that a physician at OSU had been "touching athletes." He further testified that he became aware of at least three separate complaints against Dr. Strauss involving different male students who were seen for medical appointments with Dr. Strauss at the Student Health Center while Dr. Grace was Director. He did not report any of these allegations to the Medical Board. As a result of the Medical Board's investigation, Dr. Grace surrendered his Ohio medical license to the Medical Board on April 2, 2021.[29]

176.    In June 1996, OSU held a disciplinary hearing into these complaints without notifying the student complainants or permitting them to participate.

177.    A few weeks after the hearing, in July 1996, Dr. Lombardo informed Dr. Strauss that OSU's Athletics Department was terminating his employment. In August 1996, OSU decided not to renew his Student Health Services Appointment "based on three complaints by students in a period of 13 months." *Id.* at 150.

178.    When informing Dr. Strauss that his Student Health Services Appointment was not being renewed, OSU was clear to Dr. Strauss that his faculty appointment would continue.

179.    "Strauss remained employed at the University as a tenured professor in the School of Public Health." *Id.* at 146.

180.    OSU concealed the reason that it did not renew Dr. Strauss' Student Health Services contract and terminated Dr. Strauss' employment in the Athletics Department. OSU administrators did not document the findings of the June 1996 disciplinary hearing, according to

---

[29] Bella Czajkowski et al., *Former Ohio State Doctor Who Failed to Report Strauss Abuse Surrenders Medical License*, The Lantern (April 14, 2021) https://www.thelantern.com/2021/04/former-ohio-state-doctor-who-failed-to-report-strauss-abuse-surrenders-medical-license/#:~:text=Former%20Ohio%20State%20Director%20of,Medical%20Board%20of%20Ohio%20Wednesday.

sworn testimony—though it would have been standard to do so.

181. Even after OSU's Student Health *suspended Dr. Strauss* in January 1996 as a treating physician, OSU administrators hid the *reason* why it was investigating Strauss and placing him on leave, according to Dr. Lombardo's and Dr. Miller's sworn testimony. OSU administrators did not inform the Athletics Department why his Student Health contract was not renewed.

182. Dr. Lombardo testified that it would have been "important to know" that Dr. Strauss was being investigated for sexual misconduct, because it would have helped him "protect the athletes." But OSU hid that information to protect Dr. Strauss and itself.

183. Dr. Lombardo testified that OSU students never even knew that OSU terminated Dr. Strauss from the Athletics Department over the summer: "doctors come and go," so it would not have been "unusual" for students to "have a new doctor" in the fall of 1996.

184. OSU also actively concealed Dr. Strauss' abuse by not investigating or attempting to identify the students Dr. Strauss harmed. Dr. Grace told the Medical Board that "there are many male athletes that have been abused by Dr. Strauss." Yet numerous OSU doctors confirmed that OSU took no action to identify the students victimized by Dr. Strauss. OSU did not attempt to identify these "many" male athletes so it could conceal the extent of Dr. Strauss' abuse and how the university had enabled his predation.

185. OSU further concealed Dr. Strauss' abuse by destroying medical records. Even after OSU determined that Dr. Strauss was a sexual predator, it destroyed evidence of Dr. Strauss' sexual predation. OSU's standard policy at the time was to preserve patient records for seven years, *unless* there was a reason to maintain the patient records. Yet at no point in 1995 (when Student A and B complained), in 1996 (when OSU suspended Dr. Strauss and then

terminated his contract), or thereafter did OSU stop its policy of destroying records once they were seven years old, according to the testimony by numerous OSU doctors.

186. As late as February 1997, Dr. Strauss was a member of the appointments, promotion, and tenure committee of the OSU School of Public Health, which, among other things, was reviewing a faculty appointment for Dr. Grace.

187. Here is how Dr. Grace put it:

Q. Should Dr. Strauss have any position of authority whatsoever at Ohio State after January 1996, in your opinion?
A. Not in my opinion.

Q. Why not?
A. Because he was found not fit for clinical practice.

Q. Because he was a sexual predator, right?
A. Yes.

Q. So you had this sexual predator who was employed by Ohio State University for a couple of years after it was clear to you that he was a sexual predator, right?
A. Yes.

Q. And that is -- what word would you use to describe OSU's decision to keep this man for all of those years?
A. Unfortunate.

188. In October 1997, Dr. Strauss announced that he intended to retire.

189. Randall Harris, the Acting Director of the School of Public Health, recommended that Dr. Strauss receive emeritus status upon retirement "based on his long-standing service, commitment, and national and international achievements." *Id*. at 6.

190. Harris made this recommendation even though he was aware that a student-patient at Student Health had complained about Dr. Strauss' treatment of his sexually transmitted disease ("STD"), that the complaint was serious enough to result in a hearing, and that Dr.

Strauss was removed from Student Health and Athletics.

191.    Ronald St. Pierre, the Vice Dean and Secretary for the College of Medicine and Associate Vice President of Health Sciences and Academic Affairs, also recommended Dr. Strauss receive an emeritus appointment, though he was aware of the 1996 Student Affairs disciplinary action against Dr. Strauss.

192.    Dr. Strauss retired effective March 1, 1998.

193.    Upon his retirement, OSU's Board of Trustees bestowed on him the honorific appointment of Faculty Emeritus in the University's School of Public Health. *Id.* at 154.

194.    Even Dr. Grace calls that decision "crazy."

195.    In allowing Dr. Strauss to retire and receive a Faculty Emeritus appointment, OSU actively concealed both Dr. Strauss' abuse and the university's role in enabling his predation.

196.    As OSU Dr. William Malarkey testified, terminating Dr. Strauss or revoking his tenure would have alerted students that Dr. Strauss' conduct may not have been appropriate.

> Q. A student hearing that a professor retired would have no cause for alarm, correct?
> A. Yes.
>
> Q. And a student hearing that a professor received emeritus status would have no cause for alarm?
> A: Yes.
>
> Q. And to the contrary, if a student hears that a professor's tenure was revoked, that could create cause for alarm, right?
> A: Yes.

197.    While Dr. Strauss was on administrative leave in March 1996, he began considering opening a private, off-campus medical clinic specializing in men's issues.

198.    Dr. Strauss spoke to St. Pierre about his plans for opening this men's clinic. St.

Pierre said "there would be no problem" with Dr. Strauss opening that private men's clinic. *Id.* at 151.

199. Dr. Strauss did, in fact, open that men's clinic off-campus clinic near OSU's campus to treat "common genital/urinary problems"—even though he was trained as a pulmonologist—and solicited male students for sexual health treatment in OSU's student newspaper. He began seeing patients there in September 1996.

200. OSU did nothing to protect students from being abused by Dr. Strauss at the men's clinic, even though it had removed him from working at the Student Health Center because of a sexual misconduct complaint.

201. OSU's deliberate indifference is beyond dispute. "Despite the persistence, seriousness, and regularity of such complaints [from male students between 1979 and 1996], no meaningful action was taken by the University to investigate or address the concerns until January 1996 . . . ." *Id.* at 3.

### No OSU Student Could Have Known OSU's Responsibility For The Abuse

202. OSU hid the extent of Dr. Strauss' abuse, the repeated complaints OSU received, and its indifferent response from its students. Dr. Grace, who was in an important position at OSU, claimed to have no knowledge of these widespread complaints about Dr. Strauss. He admitted that an OSU student would be even more in the dark:

> Q. Is there any way any Ohio State student could have known that their university failed on the job for 20 years to get rid of this sexual predator?
> A. I don't know of any way.

203. Similarly, Dr. Miller testified:

> Q. And is there any way OSU – any OSU student could have known that Dr. Strauss was a sexual predator against students for over 20 – for approximately 20 years before OSU got rid of him?

A.      I don't believe they would have known.

204.    None of the Plaintiffs knew, or had reason to know, of OSU's role in Dr. Strauss' sexually abusive medical examinations. None of the Plaintiffs knew, or had reason to know, that OSU had received complaints—for years—about Dr. Strauss' conduct. None of the Plaintiffs knew, or had reason to know, that OSU failed to appropriately investigate, remedy, and respond to years of complaints. None of the Plaintiffs knew, or had reason to know, that OSU failed to adequately supervise Dr. Strauss, even after learning that he posed a substantial risk to the safety of male students and student-athletes. None of the Plaintiffs knew, or could have known, that in 1996, OSU declined to renew Strauss' appointment with Student Health and the Athletic Department terminated his employment agreement because OSU "recogniz[ed] . . . the severity and pervasiveness of Strauss' abuse." Medical Board Report at 3. None of the Plaintiffs knew, or had reason to know, that OSU administrators were on notice of Dr. Strauss' pervasive sexual abuse, or that OSU administrators were deliberately indifferent to that pervasive sexual abuse.

205.    Dr. Strauss committed suicide in 2005. After Dr. Strauss committed suicide, Dr. Lombardo lauded him as "one of the leaders in sports medicine," and highlighted "his care and concern for athletes."

206.    The effects of his abuse, and OSU's complicity in it, survive in the lives of his victims.

**<u>OSU's Commissioned Investigation</u>**

207.    In April of 2018, approximately forty years after students first began complaining about Dr. Strauss' abuse, OSU announced that it was opening an investigation into student-athletes' allegations of sexual misconduct by Dr. Strauss dating back to the late-1970s.

208.    OSU opened this investigation in 2018 after one or more former student-athletes

(again) informed OSU of Dr. Strauss' sexual abuse.

209.    Until OSU opened its investigation in April of 2018, most of the Plaintiffs did not understand that Dr. Strauss had sexually assaulted and harassed them in the guise of providing necessary and appropriate medical care. And none of them knew, or had any reason to know, of the role that OSU played in facilitating Dr. Strauss' abuse. This is because OSU ignored, rebuffed, and concealed complaints about Dr. Strauss, preventing the Plaintiffs from discovering their claims against OSU.

210.    The appointed Special Counsel to OSU, Porter Wright Morris & Arthur LLP, retained Perkins Coie LLP ("Perkins Coie") on April 27, 2018. *Id.* at 1.

211.    On OSU's behalf, Perkins Coie conducted a massive factual investigation of sexual misconduct allegations raised against Dr. Strauss. Perkins Coie evaluated, first, "allegations that Strauss committed acts of sexual misconduct against members of the OSU community." *Id.* at 1. Second, Perkins Coie evaluated "whether 'the University' had knowledge of such allegations against Strauss" while he was employed by OSU. *Id.*

212.    Perkins Coie spent $6.2 million and 12 months on their investigation.

213.    Perkins Coie reviewed 825 boxes of records from OSU and collected records from sources outside the University. They interviewed 520 witnesses, including 177 survivors.

214.    Perkins Coie's 182-page Report reaches two striking conclusions: First, finding the survivors uniformly credible, it found that "Strauss sexually abused at least 177 male student-patients he was charged with treating as a University physician." *Id*. Perkins Coie concluded that "at least" 177 men were abused because they only interviewed 177 male students—had they interviewed more survivors they undoubtedly would have concluded that Dr. Strauss abused far more than 177 men. Perkins Coie did not interview the majority of the Plaintiffs in this action.

215.    Second, Perkins Coie found that OSU "personnel had knowledge of Strauss' sexually abusive treatment of male student-patients as early as 1979." *Id*.

216.    The Perkins Coie report provides detailed, credible evidence of Dr. Strauss' serial sexual predation and OSU's institutional indifference to complaints about Dr. Strauss.

217.    Yet OSU is in "damage control mode." It does not want to be held fully accountable for employing a serial sexual predator and perpetuating his abuse of students for two decades.

218.    But enough is enough. Remedial action to help the survivors of Dr. Strauss' sexual predation is long overdue, as is systemic institutional change to ensure that something like this never happens again to another OSU student.

### OSU's Pattern of Indifference to Sexual Harassment and Abuse

219.    OSU's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at OSU for the last four decades. This toxic culture, which has drawn the attention and censure of the federal government, continues to thrive to this day.

220.    On June 23, 2010, the United States Department of Education's Office for Civil Rights ("OCR") initiated a review of OSU's compliance with Title IX. With the federal government peering over its shoulder, OSU rushed to revise its sexual abuse policies and procedures.[30] Nevertheless, on September 11, 2014, after a four-year-long review of OSU, OCR announced that the university had violated Title IX.[31]

221.    Specifically, OCR found that OSU's policies and procedures were confusing and inconsistent, failed to designate timeframes for the completion of major stages of sexual abuse investigations, and failed to ensure that complainants were afforded equal opportunity to

---

[30] OCR Findings Letter, *supra* note 4, at 24.

[31] *Id.* at 1.

participate in the grievance process, in violation of Title IX.[32]

222.    OCR also found that students were confused about how and where to report incidents of sexual harassment and assault.[33]

223.    OCR likewise found that OSU's procedures "inappropriately suggest and, in some instances, seem to require that parties work out alleged sexual harassment directly with the accused harasser prior to filing a complaint with the University."[34]

224.    In some cases, OCR was unable even to reach a determination about whether OSU adequately responded to complaints because OSU's complaint files were so sloppy and indecipherable.[35]

225.    In order to close the federal government's review, OSU entered into a resolution agreement with OCR. That agreement required OSU, in part, to disseminate information to educate students and staff about Title IX's prohibition against sexual abuse and harassment, and how to report incidents. It also required OSU to revise its policies and procedures to eliminate the requirement that students "work out" sexual harassment and abuse directly with their abuser. And it required OSU to provide mandatory training on sexual abuse to students and staff.[36]

226.    After the federal government initiated its investigation into OSU's practices, OSU began its own investigation into a sexual harassment complaint concerning its Marching Band.

227.    OSU's internal investigation found that the Marching Band's culture facilitated

---

[32] *Id.* at 1, 9, 26.

[33] *Id.* at 10.

[34] *Id.* at 25.

[35] *Id.* at 19, 27.

[36] *Id.* at 27-29; *see also* Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf.

sexual harassment and created a sexually hostile environment for its students.[37] Students in the Marching Band were called sexual nicknames, like "Boob Job" and "Twinkle Dick," and pressured to participate in an annual nude Marching Band tradition.[38] Students felt that the Marching Band's culture was sexualized and an "old guys" club, and that it operated under a "culture of intimidation," which culminated in at least one known sexual assault as well as sexual harassment.[39] Most damningly, the investigation found that OSU had notice of the hostile environment but had failed to do anything about it.[40]

228. A year after OCR found OSU non-compliant with Title IX, the University launched an initiative designed to "ensure Ohio State is a national leader" in preventing and responding to sexual abuse.[41]

229. If only OSU's actions were as good as its words.

230. In 2014, during a diving meet, OSU received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor in OSU's Diving Club. Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet.[42]

231. OSU then allegedly failed to take action to address the hundreds of naked photographs of the victim engaged in sexual acts that Coach Bohonyi had forced her to take.[43]

---

[37] Ohio State University Investigation Report, Complaint against Jonathan Waters, Director of the OSU Marching Band 1 (July 22, 2014), http://www.documentcloud.org/documents/1235398-osu-investigation-report-complaint- against.html [hereinafter "OSU Report regarding Complaint against Waters"].

[38] *Id.* at 4-5.

[39] *Id.* at 11-12.

[40] OCR Findings Letter, *supra* note 4, at 2; OSU Report regarding Complaint against Waters, *supra* note 35, at 1.

[41] OSU Plan, *supra* note 5.

[42] Diving Complaint, *supra* note 6, at ¶¶ 272, 274-75.

[43] *Id.* at ¶¶ 176-180, 260-62.

These photographs—child pornography—allegedly sat in OSU's possession for some four years.[44]

232.  Revelations of OSU's ongoing culture of abuse continue to accumulate. For instance, in June of 2018, OSU was forced to shutter its sexual assault prevention and response unit after concerns emerged that unit employees had told victims of abuse they were "lying," "delusional," and had "an active imagination."[45] Other victims were denied services because they would not disclose the identity of their attackers.[46] An independent audit of that unit revealed that it failed to report *57 potential felonies* that it was required to report to law enforcement—felonies that likely involve sexual assault.[47]

233.  On August 8, 2018, OCR initiated yet another investigation into OSU's compliance with Title IX—this time involving OSU's response to students' allegations of sexual misconduct by Dr. Strauss, the subject of this lawsuit.

234.  Despite all evidence to the contrary—a federal investigation finding Title IX violations, numerous student complaints, internal reports, witnesses, and more—OSU persists in claiming it is and has been "a leader" on issues of sexual abuse.[48] The survivors of its four decades of indifference beg to differ.

## SPECIFIC FACTUAL ALLEGATIONS

235.  Plaintiffs incorporate by reference the allegations in all previous paragraphs as if

---

[44] *Id.* at ¶ 180.

[45] Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints*, Columbus Dispatch (June 19, 2018, 4:00 PM), http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-after-complaints; Bauer-Wolf, *supra* note 8.

[46] *See* Bauer-Wolf, *supra* note 8.

[47] Smola, *Ohio State's troubled sexual assault center failed to report 57 potential felonies, audit finds*, *supra* note 9.

[48] Smola, *Ohio State closes 'failed' program, takes another hard look at Title IX policies, supra* note 8.

fully stated here.

## TIMOTHY MOXLEY

236.    Timothy Moxley was an undergraduate student at OSU from 1985 to 1989 and a member of the OSU wrestling team and football team.

237.    Before becoming a student at OSU, while Moxley was participating on his high school wrestling team for a state title, Moxley was abused at least two to four times by Dr. Strauss at St. John Arena on OSU's campus. He was 16 years old when he was first abused.

238.    From 1985 to 1987, while a student at OSU, Moxley was abused by Dr. Strauss during at least two physical exams and at least eight medical appointments.

239.    Moxley was recruited to OSU to compete on its football and wrestling teams. He competed on the football team from 1985 to 1989. Because the football team preferred that he not also participate on the wrestling team, Moxley participated on the wrestling team only two years (as a sophomore and junior). He was required to undergo multiple physical exams and medical appointments with Dr. Strauss each fall of 1985 through 1987, as part of his participation on the football and wrestling teams.

240.    OSU training and medical staff, told Moxley that the physical exam was required in order for him to compete on the football and wrestling teams. An OSU employee scheduled most of Moxley's physical exams and medical appointments with Dr. Strauss; some were initiated by Dr. Strauss himself. All exams and appointments other than the 1984 St. John Arena exams, took place at Larkins Hall (wrestling team exams) or the Biggs Athletic Center (football team exams).

241.    In 1984, Moxley participated in the Ohio high school wrestling state championship at St. John Arena on OSU's campus. OSU hosted the Ohio state wrestling championship annually. Before his participation, he had a knee injury. Dr. Strauss knew

Moxley's older brothers, who were both OSU wrestlers. Dr. Strauss told Moxley he would perform a pre-tournament exam at St. John Arena. He took Moxley, alone, to the training room at St. John Arena. Without gloves, Dr. Strauss began aggressively fondling Moxley's penis and testicles for a prolonged period of time as Dr. Strauss was prepping Moxley's knee for competition. Moxley expressed confusion because he simply had a knee injury, but Dr. Strauss responded that he just wanted to check and make sure he was healthy and there were no medical concerns. Over the course of the three or four days of the tournament, Dr. Strauss repeated this same knee check-up at least seven times, each time concluding the check-up by wrapping Moxley's knee. Dr. Strauss did not wear gloves at these exams.

242. During the 1984 tournament, Moxley was being actively recruited by OSU and OSU wrestling coaches were evaluating Moxley at the tournament.

243. In 1985, at Moxley's first physical exam as an OSU student and as part of his participation on the OSU football team, Dr. Strauss performed one of the procedures of Moxley's initial physical examination. After Moxley had seen other doctors for blood pressure, heart rate, and joint evaluation, Moxley was directed to Dr. Strauss. Upon entering the exam room, Dr. Strauss told Moxley to drop his pants to do a hernia check. Dr. Strauss began aggressively fondling Moxley's penis and testicles for a prolonged period of time. Dr. Strauss did not wear gloves at this exam.

244. In 1986, at Moxley's second physical exam as an OSU student and as part of his participation on the wrestling team, Dr. Strauss told Moxley to get completely undressed. Moxley undressed and sat on the training table. Dr. Strauss sat on a stool in front of Moxley and put his face near Moxley's genitals. He began fondling Moxley's penis and testicles. He stroked Moxley's penis and testicles for several minutes. He told Moxley that this was part of the

examination because he wanted to check for a hernia and for genital warts. He then told Moxley that he needed to perform a prostate check and proceeded to digitally penetrate Moxley's anus and feel his prostate. Dr. Strauss did not wear gloves at this exam.

245.    Moxley was required to attend an additional physical exam with Dr. Strauss in January 1987. The exam proceeded in the same manner as the first exam. Dr. Strauss put his face near Moxley's genitals, fondled Moxley's penis and testicles, and digitally penetrated Moxley's anus. Dr. Strauss did not wear gloves at this exam.

246.    Moxley felt uncomfortable during all exams, but Dr. Strauss provided reasons for the treatment on all occasions.

247.    On at least eight occasions from 1985 to 1987, Moxley needed medical attention for his knee or his rapid weight loss related to wrestling. On most of these occasions, OSU athletic personnel directed Moxley to Dr. Strauss. On a few of these occasions, Dr. Strauss approached Moxley at Larkins Hall and instructed Moxley to come into the exam room for a check-up.

248.    All of these exams proceeded in the same manner as the second and third required physical exams; Dr. Strauss was in a private exam room with Moxley. He put his face near Moxley's genitals, fondled Moxley's penis and testicles for a prolonged period of time, and digitally penetrated Moxley's anus. Towards the end of Moxley's sophomore year, Moxley began to decline the rectal exams, so his final approximately three examinations did not include digital penetration. In those approximately three exams, Dr. Strauss put his face near Moxley's genitals and fondled Moxley's penis and testicles for a prolonged period of time. Dr. Strauss did not wear gloves at any of these exams.

249.    While at OSU, Moxley's teammates on both the wrestling and football teams

joked about exams with Dr. Strauss, saying things like, "Are you going over to his side?" and "Are you becoming one of those guys now?" The teammates on the football team joked openly about Dr. Strauss saying these things in front of OSU football medical staff. The teammates on the wrestling team joked openly about Dr. Strauss saying these things in front of OSU wrestling trainers.

250.     Moxley was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

251.     While Moxley was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examination, Moxley did not understand or believe that Dr. Strauss had sexually abused him.

252.     Moxley reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

253.     Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Moxley did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

254.     Even if, while Moxley was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

255.     In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Moxley did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that

OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

256.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Moxley would not have been abused by Dr. Strauss.

257.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Moxley has suffered physical, emotional, and psychological damages. After the abuse, Moxley almost left school his sophomore year. He began seeing an OSU psychologist to cope with his anger, stress, and anxiety. He still feels anger towards OSU for not protecting student athletes like himself. He has had a very difficult time seeing doctors and is anxious when he has to endure a doctor visit. He has avoided necessary medical care in the past.

## RYAN CALLAHAN

258.    Ryan Callahan was an undergraduate student at OSU from 1995 to 1997 and a member of the OSU lacrosse team.

259.    From 1995 to 1997, while a student at OSU, Callahan was abused by Dr. Strauss during at least two physical exams and two medical appointments. He was 19 years old at the time that he was first abused.

260.    Callahan competed on the OSU lacrosse team from 1995 to 1997. He was required to undergo a physical exam with Dr. Strauss in 1995 and 1996 as part of his participation on the lacrosse team for a total of two examinations.

261.    The OSU lacrosse coaches told Callahan that the physical exam was required in order for him to compete on the lacrosse team. An OSU employee scheduled Callahan's physical exam appointments with Dr. Strauss, which took place at Larkins Hall.

262.    At the beginning of the first exam, Dr. Strauss told Callahan to get completely undressed and sit at the edge of the exam table. Callahan complied. Callahan and Dr. Strauss

were alone in the exam room.

263.    Dr. Strauss then sat on a stool between Callahan's legs and began to fondle Callahan's penis and testicles. He repeatedly fondled and shifted Callahan's penis and stroked Callahan's testicles for a prolonged period of time.

264.    Callahan felt uncomfortable during the exam.

265.    Eventually, Dr. Strauss ended the exam and instructed Callahan to get dressed. He did not wear gloves at any time during the exam.

266.    Callahan was required to attend at least one more physical exam with Dr. Strauss to compete on the OSU lacrosse team. This exam proceeded in the same manner as the first exam—Dr. Strauss fondled Callahan's penis and testicles and repeatedly fondled and shifted Callahan's penis and stroked his testicles for prolonged periods of time.

267.    Callahan frequently saw Dr. Strauss in the team's locker room following lacrosse practices. Dr. Strauss would arrive in the locker room area before most students and he would linger there. Dr. Strauss watched lacrosse players, including Callahan, get dressed and undressed. Callahan's coaches were frequently in the locker room at the same time as Dr. Strauss and saw Dr. Strauss watching the students in states of undress. When the lacrosse team finished dressing, Callahan often witnessed Dr. Strauss walking to the entrance of the OSU baseball team showers to talk with baseball players as they showered.

268.    Dr. Strauss' exams and his presence in the locker room made Callahan uncomfortable and were a topic of conversation among his teammates and coaches. Teammates and Callahan complained to OSU lacrosse coach Paul Caldwell about Strauss' exams and behavior in the locker room, but nothing was done. There came a point when Callahan became so uncomfortable that he began changing before and after practice away from the locker room.

Callahan's coaches gave the impression that he just had to get used to it and deal with it or risk not playing. None of his coaches stopped Dr. Strauss' behavior.

269.    On one occasion, Callahan needed to see a doctor to treat scabies on his legs. Callahan contacted the OSU athletic department and they scheduled Callahan to see Dr. Strauss as the OSU lacrosse team doctor.

270.    The medical appointment with Dr. Strauss began in the same manner as Callahan's physical exams. After instructing Callahan to undress, Dr. Strauss began fondling Callahan's penis and testicles. Dr. Strauss fondled and shifted Callahan's penis and stroked Callahan's penis for a prolonged period of time. Callahan believes that Dr. Strauss was trying to get him aroused. Dr. Strauss did not wear gloves during the exam.

271.    As Dr. Strauss continued to manipulate Callahan's penis, Callahan became uncomfortable to the point that he jumped off the table, put on his clothes and left the room.

272.    After Callahan left the room, Dr. Strauss gave Callahan medication and never said anything to Callahan about the exam.

273.    On a second occasion, Callahan needed to see a doctor to treat molluscum on his penis and legs. Callahan contacted the OSU athletic department and they again scheduled Callahan to see Dr. Strauss as the OSU lacrosse team doctor.

274.    Callahan's medical appointment to treat the molluscum went similar to his appointment to treat the scabies. After being told to remove all his clothes and sit on the exam table, Dr. Strauss began to fondle and stroke Callahan's penis for a prolonged period in an apparent attempt to arouse Callahan. During this episode of fondling, Dr. Strauss was even more aggressive and deliberate in stroking Callahan's penis than prior visits as the molluscum was, in part, on the penis, and Dr. Strauss told Callahan that the treatment was because the molluscum

was on Callahan's penis.

275.    Dr. Strauss routinely attended OSU lacrosse practice and took photographs of the team as they practiced. Dr. Strauss offered to take photographs of Callahan and his friend who were interested in modeling. Dr. Strauss told Callahan to come to his home. Upon arriving at Dr. Strauss' residence, Dr. Strauss' demeanor made Callahan so uncomfortable that he quickly left the house without posing for any photographs.

276.    Callahan was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

277.    Callahan's lacrosse coaches told him that Dr. Strauss' examinations were required to continue playing lacrosse for OSU. Callahan saw one coach, Jacques Monte, witness another lacrosse player pretending to smoke a cigarette after exiting from a Dr. Strauss examination. Coach Monte laughed and said, "Show up and take it like a man."

278.    While Callahan was an OSU student, he trusted that OSU would not allow him to be harmed. Student-athletes openly joked in front of OSU lacrosse staff about Dr. Strauss' examinations and his lingering in the locker room to watch students undress; yet, the lacrosse coaches continued to require Callahan and other athletes to see Dr. Strauss for examinations and treatment. So, even though he felt uncomfortable during Dr. Strauss' examination, Callahan did not understand or believe that Dr. Strauss had sexually abused him.

279.    Callahan reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

280.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Callahan did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or

that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

281.    Even if, while Callahan was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

282.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Callahan did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

283.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Callahan would not have been abused by Dr. Strauss.

284.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Callahan has suffered physical, emotional, and psychological damages. Around the period of his abuse, and ever since, Callahan has been terrified of going to the doctor for any treatment. Callahan himself rarely sees any physician and refuses to have a prostate exam. He avoids even dentists and eye exam appointments. He is also terrified of his children seeing the doctor unattended and ensures he attends all doctor visits with his children.

## JOHN JACKSON, JR.

285.    John Jackson, Jr., was a student at OSU from 1985 to 1987, and was a member of OSU's varsity cheerleading team from 1986 to 1987. Jackson received an academic need-based scholarship for minority students from underrepresented communities. Jackson returned to OSU to finish his degree in 2009, which he obtained in 2011.

286.    Jackson relied on his scholarship to attend college.

287.    Jackson saw Dr. Strauss once in the spring of 1986 for a physical exam.

288.    While Jackson was a cheerleader at OSU, Coach Sherri Moore coached the cheerleading team.

289.    Coach Moore joked with the cheerleaders to keep their "heads up" for Dr. Strauss but did not tell them specifically why they needed to keep their "heads up." Despite her instruction for students to be watchful of Dr. Strauss, Coach Moore required Jackson and the rest of the team to have a physical exam with Dr. Strauss.

290.    During his examination, Jackson was alone with Dr. Strauss at a building on OSU's campus. Dr. Strauss instructed Jackson to remove all of his clothing.

291.    During the examination Dr. Strauss penetrated Jackson's anus with a finger. His finger remained in Jackson's anus for a prolonged period.

292.    Dr. Strauss then said words to the effect that he was examining Jackson's genitalia to make sure "everything is normal, everything is okay."

293.    Dr. Strauss had Jackson stand in front of the exam table and began fondling Jackson's penis and testicles. Jackson became erect and subsequently ejaculated. After Jackson ejaculated, Dr. Strauss said, "Okay, everything looks normal."

294.    After Jackson's exam, some of his teammates joked about their experiences with Dr. Strauss. Jackson remarked that Dr. Strauss "got me too" without elaborating further.

295.    Jackson observed Dr. Strauss having sex with athletes from other athletic teams in the Larkins Hall sauna. Dr. Strauss often lingered in the Larkins Hall sauna or steam room and Jackson believed he did so to try to have sex with Jackson and other student athletes.

296.    Jackson did not know Dr. Strauss' behavior during his physical exam was something that he could complain about, and he was never informed or made aware of any OSU

grievance procedure to complain about Dr. Strauss.

297.    While Jackson was an OSU student, he trusted that OSU would not allow him to be harmed. So, although he felt uncomfortable during Dr. Strauss' examinations, Jackson did not understand or believe that Dr. Strauss had sexually abused him.

298.    Jackson reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. He trusted that OSU would not employ a sexual abuser.

299.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Jackson did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had also harmed him.

300.    Even if, while he was an OSU student, Jackson had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

301.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Jackson did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

302.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Jackson would not have been abused by Dr. Strauss.

303.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Jackson suffered physical, emotional, psychological, and economic damages. After Dr. Strauss' abuse, Jackson felt guilt and shame, and was convinced that this was the kind of experience he would have to

tolerate as an athlete. Dr. Strauss' abuse contributed to Jackson's decision to leave OSU. Jackson began using drugs heavily and drinking to dull his emotions. Jackson did not get clean until 2013. Jackson has needed therapy to help him process his trauma. Dr. Strauss' abuse contributed to him and his spouse getting divorced. Even though Jackson knows it is not his fault that Dr. Strauss abused him, he is still fearful about being blamed for what Dr. Strauss did.

## JAMES CARROLL

304.    James Carroll was a student at OSU from 1984 to 1986 and from 1996 to 1999. He was a member of OSU's football team from 1984 to 1986, and had a full athletic scholarship.

305.    Carroll relied on his scholarship to attend college.

306.    While a student at OSU, Carroll was abused by Dr. Strauss during an exam in December 1984.

307.    Carroll suffered an injury to a testicle while participating in OSU football team drills.

308.    Carroll was directed to Dr. Strauss by OSU athletic staff because the football team physician, Dr. Robert Murphy, and trainer Billy Hill were travelling and unavailable.

309.    Dr. Strauss told Carroll that he wanted to conduct a full physical exam. Carroll questioned whether he needed a full physical, but Dr. Strauss insisted.

310.    Dr. Strauss asked Carroll to get completely undressed. Carroll disrobed and stood in the middle of the room. Carroll and Dr. Strauss were alone in the room.

311.    Dr. Strauss told Carroll to turn around and put his elbows on the exam table. After Carroll complied, Dr. Strauss positioned a stool close to Carroll's backside. Strauss sat down with his face so close to Carroll's genitals that his face was almost resting on Carroll's leg.

312.    Dr. Strauss reached around Carroll's body and fondled Carroll's genitals for a

prolonged time with his ungloved hands. He then began stroking Carroll's penis.

313.    Carroll turned around and asked Dr. Strauss, "What are you doing?" Dr. Strauss replied, "I'm trying to examine you."

314.    Carroll felt distressed. He pushed Dr. Strauss away, got dressed, and left the training room.

315.    Carroll was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

316.    While Carroll was an OSU student, he trusted that OSU would not allow him to be harmed.

317.    Carroll reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations and treatments, Carroll did not understand or believe that Dr. Strauss had sexually abused him.

318.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Carroll did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

319.    Even if, while Carroll was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

320.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Carroll did not know, or have reason to know, that Dr. Strauss

had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

321.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Carroll would not have been abused by Dr. Strauss.

322.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Carroll has suffered physical, emotional, and psychological damages. After his exam, Carroll lost trust in OSU and lost his drive to attend classes. His grades suffered to the point where his scholarship was revoked and he was academically dismissed from the University in the spring quarter of 1986. Carroll is unable to visit the OSU campus without feeling serious emotional distress and has avoided visiting the campus as a result. He feels outraged and betrayed by OSU because it allowed Dr. Strauss to remain a treating physician on campus for years after knowing about Dr. Strauss' abuse.

## JEFFREY ROHDE

323.    Jeffrey Rohde was a student at OSU from 1986 to 1990.

324.    Rohde was a member of OSU's club soccer team from 1986 to 1987.

325.    In the summer of 1986, shortly before his first soccer season began, OSU required Rohde and the other soccer players who made the club soccer team to be examined by Dr. Strauss.

326.    Prior to his physical with Dr. Strauss, older student-athletes told the younger athletes words to the effect of: "get ready, he'll spend more time with your junk than any doctor ever has before."

327.    During his physical, Rohde was alone with Dr. Strauss in an exam room on OSU's campus.

328.   Dr. Strauss did not wear gloves during the exam.

329.   Dr. Strauss instructed Rohde to remove his clothes, walk across the room, and bend over. Dr. Strauss told him he wanted to check his gait and check for scoliosis. Rohde complied.

330.   Dr. Strauss then told Rohde to lay down on the exam table.

331.   While Rohde was laying on the exam table, Dr. Strauss moved Rohde's penis back and forth and lifted his scrotum. Dr. Strauss felt "intensively" around Rohde's genitals for several minutes, causing his penis to become erect.

332.   While Rohde's penis was still erect, Dr. Strauss instructed Rohde to stand between him and the exam table for a hernia check, while Dr. Strauss was sitting on a low stool. Rohde's penis was right next to Dr. Strauss' face.

333.   Dr. Strauss, with Rohde's erect penis near his face, proceeded to talk to Rohde for a prolonged period of time before conducting the hernia check. Dr. Strauss fondled Rohde's scrotum for a similarly prolonged period of time while he was speaking to Rohde, longer than he had ever before or since been examined during any sports hernia exams.

334.   Rohde felt embarrassed and uncomfortable. At the time Rohde did not realize that Dr. Strauss was sexually abusing and harassing him.

335.   The next year, Rohde did his required physical exam at home to avoid seeing Dr. Strauss.

336.   Up to two to three times a week during both of his seasons playing soccer on the OSU club team, Rohde saw Dr. Strauss in the showers at the end of soccer practice. Dr. Strauss would run as little as a half lap in order to go into the showers with the student-athletes afterwards.

337.    Dr. Strauss would at times be the first person in the shower and the last person out. Dr. Strauss was often in the shower when Rohde showered.

338.    Dr. Strauss' conduct in the locker room was often joked about among the soccer players and commented on by OSU assistant coaches, who described it as disgusting and creepy. On multiple occasions, the assistant coaches accompanied Rohde and other students to the shower area after workouts in an effort to deter Dr. Strauss from joining, but Dr. Strauss was not deterred.

339.    Although Rohde felt that Dr. Strauss' conduct during his physical and in the locker room was strange, he did not realize at the time that Dr. Strauss was sexually abusing and harassing him and his teammates.

340.    Rohde was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

341.    Rohde also did not think that complaining was an option, given that everyone seemed to know about Dr. Strauss' conduct and accepted it as normal.

342.    While Rohde was an OSU student, he trusted that OSU would not allow him to be harmed.

343.    While student-athletes openly joked about Dr. Strauss' examinations in front of OSU soccer staff, the soccer coaches continued to require Rohde and other athletes to see Dr. Strauss for examinations and treatment, and Rohde reasonably believed that OSU would not have required him and other student-athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, although he felt uncomfortable during Dr. Strauss' examination, Rohde did not understand or believe that Dr. Strauss had sexually abused him.

344.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Rohde

did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

345.    Even if, while he was an OSU student, Rohde had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

346.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Rohde did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

347.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Rohde would not have been abused by Dr. Strauss.

348.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Rohde has suffered physical, emotional, and psychological damages. After the exam, Rohde wondered if something was wrong with him because his penis had become erect. He feels anxiety when he thinks about what happened during Dr. Strauss' exam. Dr. Strauss' abuse contributed to Rohde's decision to quit soccer after his sophomore year and stop pursuing a medical career, which had been his dream since childhood. Because of Dr. Strauss' abuse, Rohde has not allowed his children to be alone with a doctor and has aimed to coach his children's sports teams. Rohde and his spouse have aimed to be present whenever their children would be alone with an adult, particularly when the children were younger and did not have voices of their own.

**PATRICK MURRAY**

349.    Patrick Murray was a student at OSU from 1983 to 1984, 1988 to 1990, and 1992

to 1995.

350.    While a student at OSU, Murray was examined by Dr. Strauss at one appointment at OSU's Student Health Center in the 1992 to 1993 academic year.

351.    Murray visited the Center for treatment related to an STI. He scheduled the appointment with the Student Health Center and was assigned to see Dr. Strauss. During his visit, Murray was alone in the exam room with Dr. Strauss.

352.    At the exam, Dr. Strauss instructed Murray to remove his pants and underwear. He examined Murray's genitals for an STI. Dr. Strauss handled Murray's penis and testicles for a prolonged period of time.

353.    Dr. Strauss asked Murray about his sexual history and sexual orientation, and if he had previously engaged in anal sex. Murray informed him that he had not had anal sex. Dr. Strauss said that he wanted to do an anal exam anyway.

354.    Dr. Strauss told Murray to bend over the table, then he penetrated Murray's anus with one finger. Murray expressed verbal and physical resistance and discomfort. Dr. Strauss told Murray words to the effect of, "Relax, some people have had things bigger than a finger up there. They also enjoy it."

355.    Murray felt confused and uncomfortable. But he believed that doctors were supposed to be trusted. He did not realize that Dr. Strauss was sexually abusing and harassing him.

356.    After the appointment, Murray told Student Health Center staff that he felt uncomfortable with Dr. Strauss and did not want to be seen by Dr. Strauss again. He told the staff that he only wanted to be seen by female doctors from that point forward. Nobody on the Student Health Center staff asked Murray why he was uncomfortable or whether Dr. Strauss had

done something to make him uncomfortable.

357.    While he was a student at OSU, Murray did not know what to do about Dr. Strauss' conduct. He was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

358.    While Murray was an OSU student, he trusted that OSU would not allow him to be harmed.

359.    Murray reasonably believed that that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, Murray did not understand or believe that Dr. Strauss had sexually abused him.

360.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, Murray did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

361.    Even if, while Murray was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

362.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, Murray did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

363.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, Murray would not have been abused by Dr. Strauss.

364.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, Murray has suffered physical, emotional, and psychological damages. Murray experienced a period of severe depression after his exam. Dr. Strauss' abuse also affected Murray's ability to be physically intimate with romantic partners. Murray is outraged and disgusted with OSU for its inaction and failure to protect students from Dr. Strauss. He feels betrayed by OSU because it allowed Dr. Strauss to remain a treating physician on campus for years after knowing about Dr. Strauss' abuse.

## JOHN DOE 78

365.    John Doe 78 attended OSU full time from 1991 through 1994 and was a member of OSU's baseball team during that period. He left OSU for athletic pursuits after the 1994 baseball season, and returned periodically until he graduated in or about 2000.

366.    OSU gave him a partial athletic scholarship. John Doe 78 relied on his scholarship to attend college.

367.    John Doe 78 was examined by Dr. Strauss during three annual baseball physicals. Dr. Strauss also treated a skin tag John Doe 78 had in one armpit.

368.    OSU's baseball team required John Doe 78 and the other team members to be examined by Dr. Strauss for annual physicals to confirm medical eligibility to play on the team.

369.    During his first required physical exam, Dr. Strauss instructed John Doe 78 to pull down his shorts and underpants so he could conduct a hernia exam; John Doe 78 complied. While Dr. Strauss sat on a stool, he instructed John Doe 78, who was standing, to come close to Dr. Strauss. Dr. Strauss' face was mere inches from John Doe 78's genitals. Dr. Strauss then manipulated John Doe 78's penis and testicles for a prolonged period of time with his ungloved hands, moving them side to side as he instructed John Doe 78 to cough. Dr. Strauss then told

John Doe 78 to completely remove his shorts and underpants and spread his legs wider; John Doe 78 complied. Dr. Strauss then slid his hand under John Doe 78's scrotum as he stroked John Doe 78's penis. John Doe 78's penis became partially erect. Given Dr. Strauss' prolonged exam, John Doe 78 asked if everything was okay. Dr. Strauss stated that the exam was normal and routine, but John Doe 78 was concerned something was medically wrong with him.

370. During the second required physical exam, Dr. Strauss again manipulated John Doe 78's penis and testicles for a prolonged period of time. Dr. Strauss also instructed John Doe 78 to lie on the examining table and Dr. Strauss pressed on John Doe 78's stomach and lower abdomen. Then, without warning, Dr. Strauss pulled John Doe 78's shorts and underpants down and manipulated John Doe 78's penis, causing John Doe 78's penis to become erect.

371. During the third required physical exam, Dr. Strauss instructed John Doe 78 to lower his shorts and underpants; John Doe 78 complied. John Doe 78 pulled away after Dr. Strauss examined his testicles and penis.

372. In the winter of 1993-1994, John Doe 78 needed treatment for an armpit skin tag. OSU baseball team staff directed him to Dr. Strauss at the on-campus health clinic. Dr. Strauss instructed John Doe 78 to remove his shirt and he then removed the armpit skin tag. Dr. Strauss then told John Doe 78 that skin tags tend to generate in the genital area and Dr. Strauss wanted to check. While John Doe 78 told Dr. Strauss that he did not have genital skin tags, Dr. Strauss repeatedly insisted on checking and put his hand on John Doe 78's waistband to try to lower his pants. To avoid a genital examination, John Doe 78 suggested that he check himself at home and schedule a follow-up appointment if necessary. Dr. Strauss said that when John Doe 78 returned for the necessary follow-up concerning his armpit skin tag removal, Dr. Strauss would check for potential genital skin tags. John Doe 78 chose not to schedule any follow-up appointment

concerning his armpit skin tag removal to avoid further treatment by Dr. Strauss. When asked by an OSU athletic trainer whether John Doe 78 would have a follow-up appointment, John Doe 78 made clear he refused to go back; the trainer did not probe further.

373.   Dr. Strauss never wore gloves during any of the exams.

374.   Dr. Strauss' exams made John Doe 78 feel uncomfortable and embarrassed, but John Doe 78 did not realize that Dr. Strauss' exams were sexually abusive.

375.   John Doe 78 spoke to his teammates and athletes on the OSU wrestling team and learned they had similar experiences with Dr. Strauss. The consensus was the Dr. Strauss was "weird."

376.   John Doe 78 and other OSU baseball players commonly referred to Dr. Strauss as "Dr. Jelly Fingers" and "Dr. Cock Watcher."

377.   John Doe 78 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

378.   John Doe 78 did not recognize Dr. Strauss' conduct as sexually abusive at the time.

379.   In retrospect, John Doe 78 realizes that Dr. Strauss sexually abused and harassed him and his teammates. However, he did not know or have reason to know this until 2018, when he learned of OSU's investigation into the allegations concerning Dr. Strauss.

380.   While John Doe 78 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, he reasonably believed that Dr. Strauss' behavior was part of a legitimate medical examination and did not understand or believe that Dr. Strauss had sexually abused him.

381.    This is because, while John Doe 78 attended OSU, student-athletes openly joked about Dr. Strauss' examinations, and John Doe 78 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

382.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 78 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

383.    Even if, while John Doe 78 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

384.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 78 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

385.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 78 would not have been abused by Dr. Strauss.

386.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 78 has suffered physical, emotional, and psychological damages. For years, John Doe 78 feared something was wrong with his genitals that required Dr. Strauss to examine him for a prolonged time. He has feared and mistrusted doctors and avoids seeing medical professionals who would examine his genitals. As a result, he has avoided obtaining a vasectomy and getting physicals. In addition, this caused John Doe 78 to feel nervous and cautious when his son receives required

sports physicals. When his son was younger, John Doe 78 insisted on being present for all sports physicals; as his son has gotten older, John Doe 78 instead asks his son specific, probing questions to ensure the examination was appropriate. He feels betrayed by OSU; he considers himself a proud OSU alumnus and is disheartened and angry that an institution he loves did not act to protect its students from Dr. Strauss.

## **JOHN DOE 79**

387.     John Doe 79 was a student at OSU from 1984 to 1989.

388.     While a student at OSU, John Doe 79 was examined by Dr. Strauss five times from 1985 to 1988 at OSU's Student Health Center.

389.     John Doe 79 visited the center for treatments related to sexually transmitted infections ("STIs"). During each visit, John Doe 79 was alone in the exam room with Dr. Strauss.

390.     At each exam, Dr. Strauss instructed John Doe 79 to fully disrobe.

391.     At the first exam, Dr. Strauss told John Doe 79 that he needed to check John Doe 79's ejaculation stream. Dr. Strauss fondled John Doe 79's penis and caused John Doe 79 to have an erection. He then instructed John Doe 79 to masturbate. John Doe 79 masturbated to ejaculation. Dr. Strauss then tossed paper towels on the exam bed and told John Doe 79 to clean up the semen on the floor. Dr. Strauss then prescribed John Doe 79 medication for his STI.

392.     The second, third, and fourth exams proceeded in the same manner as the first exam. Dr. Strauss fondled John Doe 79 to erection. He then instructed John Doe 79 to masturbate. John Doe 79 complied and masturbated to ejaculation. Then, at Dr. Strauss's direction, he cleaned up the semen that was on the floor.

393.     Dr. Strauss' conduct during the exams made John Doe 79 so uncomfortable that

he was afraid of going back to the Student Health Center even when he later contracted venereal warts and needed medical treatment. When John Doe 79 felt he could no longer avoid treatment, he went to the Student Health Center to have his STI treated. Dr. Strauss completed John Doe 79's initial exam, then another doctor entered the exam room with liquid nitrogen to treat the venereal warts. As the doctor was removing the warts, Dr. Strauss said to John Doe 79, "Looks like you put your pecker in the wrong holes." John Doe 79 felt humiliated, shamed, and belittled.

394.    Dr. Strauss left the exam room when the procedure ended. After Dr. Strauss left, the other doctor, unprompted, advised John Doe 79 that he did not have to seek future treatments at the Student Health Center and that he could go to the Columbus Health Department instead.

395.    Dr. Strauss' conduct during the exams made John Doe 79 uncomfortable, but he was afraid to say anything because he needed Dr. Strauss' help to treat his STI. He did not realize that Dr. Strauss was sexually abusing and harassing him.

396.    While he was a student at OSU, John Doe 79 did not know what to do about Dr. Strauss' conduct. He was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

397.    While John Doe 79 was an OSU student, he trusted that OSU would not allow him to be harmed.

398.    John Doe 79 reasonably believed that that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 79 did not understand or believe that Dr. Strauss had sexually abused him.

399.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 79 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive

conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

400.    Even if, while John Doe 79 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

401.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 79 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

402.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 79 would not have been abused by Dr. Strauss.

403.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 79 has suffered physical, emotional, and psychological damages. He feels outrage at OSU for allowing Dr. Strauss to abuse students. He suffers from severe emotional distress, including embarrassment and guilt, from his memories of his exams with Dr. Strauss. He experiences regular flashbacks of the exams. John Doe 79 avoided seeing physicians in a timely manner for needed STI treatments for about seven years after graduating from OSU. He also has scarring on his penis from the venereal wart removal because of the advanced development of the warts at the time he finally went to the Student Health Center to have them removed. John Doe 79 would have sought removal of the warts sooner if he was not afraid of being subject to Dr. Strauss' treatment.

404.    John Doe 79 is anxious about his children when they have medical appointments without him. He fears that his children will be abused, especially his child who is in college.

## JOHN DOE 80

405.    John Doe 80 was a student at OSU from 1995 to 1996, and a member of OSU's lacrosse team during that time.

406.    John Doe 80 saw Dr. Strauss for two physical exams and a training room exam. The physicals were required for OSU lacrosse players. John Doe 80 was never given an option to see anyone other than Dr. Strauss.

407.    The physical exams occurred at the Woody Hayes facility, while the training room exam occurred in a training room at the OSU Field House. Dr. Strauss and John Doe 80 were alone for the physical exams, but not for the training room exam.

408.    John Doe 80's first physical exam with Dr. Strauss was in spring of 1995.

409.    John Doe 80's second physical exam with Dr. Strauss was in the 1995-1996 academic year.

410.    At John Doe 80's first physical exam, Dr. Strauss told John Doe 80 to drop his underwear. Dr. Strauss then sat on a stool while John Doe 80 stood. Dr. Strauss brought his face so close to John Doe 80's genitals that he could feel Dr. Strauss' breath. John Doe 80's penis shrunk in response. Dr. Strauss grabbed the head of John Doe 80's penis with his thumb and index finger and pulled it out so he could grab John Doe 80's shaft. He began stroking John Doe 80's penis with one hand and cupping his testicles with another hand. Dr. Strauss then moved the hand that was on John Doe 80's testicles to John Doe 80's buttocks. Dr. Strauss stroked John Doe 80's genitals for several minutes, causing John Doe 80 to become erect.

411.    John Doe 80 felt frightened and embarrassed. After Dr. Strauss eventually stopped, John Doe 80 pulled up his pants and left. That night, John Doe 80 became extremely drunk to deal with his shame.

412.    John Doe 80's second physical exam proceeded in the same manner as his first exam except that Dr. Strauss fondled John Doe 80's genitals for a shorter, though still prolonged, period.

413.    In the 1995 to 1996 academic year, John Doe 80 was instructed by his coach, Paul Caldwell, to go see Dr. Strauss in the training room about an injury to his upper torso. When John Doe 80 arrived in the training room, Dr. Strauss told him to take off his shirt.

414.    Dr. Strauss examined skin tags on John Doe 80's chest and told John Doe 80 he had two additional nipples. Dr. Strauss then stroked John Doe 80's nipples repeatedly, approximately two dozen times. Other trainers and student-trainers were present during this examination but did not intervene or say anything.

415.    When John Doe 80 was a student-athlete at OSU, he heard students and OSU lacrosse coaches joking about appointments with Dr. Strauss. Whenever a student had an appointment with Dr. Strauss, other students would say, "Oh you're going to see the pervert," and, "Make sure you don't like it or you'll be there longer." It was a running joke that OSU lacrosse coaches would laugh at.

416.    John Doe 80 frequently saw Dr. Strauss in the student-athlete locker rooms and showers. Dr. Strauss frequently watched John Doe 80 and other students undress and shower. Dr. Strauss also undressed and showered with John Doe 80 and other students.

417.    John Doe 80 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

418.    While John Doe 80 was an OSU student, he trusted that OSU would not allow him to be harmed.

419. John Doe 80 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations and treatments, John Doe 80 did not understand or believe that Dr. Strauss had sexually abused him.

420. Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 80 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

421. Even if, while he was an OSU student, John Doe 80 had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

422. In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 80 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

423. If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 80 would not have been abused by Dr. Strauss.

424. As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 80 has suffered physical, emotional, psychological, and economic damages. In 1996, John Doe 80 became academically ineligible to play lacrosse. He would have persevered with trying to raise his grades to play lacrosse again, but he did not want to interact with Dr. Strauss again. John Doe 80 left the school without finishing his degree.

425.     After being abused by Dr. Strauss, John Doe 80 felt stressed about using the locker room showers and the possibility of running into Dr. Strauss, so he stopped showering in the locker room. He also could no longer be intimate with the woman he was dating, leading to the end of their relationship. For years after the abuse, John Doe 80 could only be intimate with a woman if he was drunk. John Doe 80 continues to feel uncomfortable having his shirt off where other people can see him.

426.     John Doe 80 did not get a physical exam for nearly two decades after his experience with Dr. Strauss. His first physical exam after his experience with Dr. Strauss was in approximately 2012. Since then he has only been willing to see women medical personnel.

427.     As a result of Dr. Strauss' abuse, John Doe 80 continues to suffer from stress and insomnia and is unwilling to hug male friends. He does not trust anyone other than his family to care for his young children and feels anxious whenever his children have to leave his family's care for any reason, especially medical appointments.

## JOHN DOE 81

428.     John Doe 81 was a student at OSU from 1988 to 1993, and a member of OSU's football team during that time. John Doe 81 attended OSU on a full athletic scholarship.

429.     John Doe 81 relied on his scholarship to attend college.

430.     John Doe 81 saw Dr. Strauss for two physical exams. The physicals were required for OSU football players, and John Doe 81 was never given an option to see anyone other than Dr. Strauss.

431.     Both of the appointments occurred at the Woody Hayes facility during the football team's scheduled physical exam day. Dr. Strauss and John Doe 81 were alone for the physical exams.

432.     John Doe 81's first physical exam with Dr. Strauss was in the fall of 1988.

433.     John Doe 81's second physical exam with Dr. Strauss was in the fall of 1989.

434.     At John Doe 81's first physical exam, Dr. Strauss told John Doe 81 to drop his underwear. Dr. Strauss then sat on a stool while John Doe 81 stood, and brought his face close to John Doe 81's genitals. Dr. Strauss began stroking John Doe 81's penis and continued to do so for several minutes. John Doe 81 had swelling in his right testicle, and Dr. Strauss spent a prolonged period of time fondling that testicle.

435.     John Doe 81 felt confused and embarrassed by Dr. Strauss' behavior.

436.     John Doe 81's second physical exam proceeded in the same manner as his first exam.

437.     John Doe 81 saw Dr. Strauss watch him and other football players in the showers.

438.     John Doe 81 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

439.     While John Doe 81 was an OSU student, he trusted that OSU would not allow him to be harmed.

440.     John Doe 81 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 81 did not understand or believe that Dr. Strauss had sexually abused him.

441.     Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 81 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive

conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

442.    Even if, while he was an OSU student, John Doe 81 had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

443.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 81 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

444.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 81 would not have been abused by Dr. Strauss.

445.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 81 has suffered physical, emotional, and psychological damages. He is frustrated and outraged at OSU for allowing Dr. Strauss to continue to examine student-athletes when OSU knew that Dr. Strauss was abusing students. He is angry that OSU did not inform past students about the 1996 disciplinary hearing against Dr. Strauss. He feels betrayed that OSU did not do anything to prevent Dr. Strauss' abuse.

**JOHN DOE 82**

446.    John Doe 82 was a student at OSU from 1986 to 1990, and a member of OSU's football team during that time.

447.    John Doe 82 saw Dr. Strauss for one physical exam. The physical was required for OSU football players, and John Doe 82 was never given an option to see anyone other than Dr. Strauss.

448.    The physical exam occurred at the Biggs Athletic Facility in 1987 during one of the football team's scheduled physical exam days. John Doe 82 and the other football players waited outside the exam room together and were called into Dr. Strauss' exam room one at a time. Dr. Strauss and John Doe 82 were alone for the physical exam.

449.    At the physical exam, Dr. Strauss told John Doe 82 to drop his underwear. Dr. Strauss conducted a typical physical exam until reaching John Doe 82's genitals. He fondled John Doe 82's penis and testicles for a prolonged time.

450.    After fondling John Doe 82's genitals, Dr. Strauss instructed John Doe 82 to turn around. Dr. Strauss inserted a finger into John Doe 82's anus for a prolonged period.

451.    Dr. Strauss questioned John Doe 82 about his sexual relationship with his girlfriend.

452.    John Doe 82 felt confused and embarrassed by Dr. Strauss' behavior.

453.    John Doe 82 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

454.    While John Doe 82 was an OSU student, he trusted that OSU would not allow him to be harmed.

455.    John Doe 82 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations and treatments, John Doe 82 did not understand or believe that Dr. Strauss had sexually abused him.

456.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John

Doe 82 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

457.     Even if, while he was an OSU student, John Doe 82 had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

458.     In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 82 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

459.     If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 82 would not have been abused by Dr. Strauss.

460.     As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 82 has suffered physical, emotional, and psychological damages. He is frustrated that OSU allowed Dr. Strauss to abuse him and other students. He is also embarrassed to have been subjected to the abuse. He feels betrayed that OSU did not do anything to prevent Dr. Strauss' abuse.

## **JOHN DOE 83**

461.     John Doe 83 was a student at OSU from 1989 to 1993, and a member of OSU's football team during that time.

462.     John Doe 83 saw Dr. Strauss for five physical exams and one or two medical appointments for treatment of a groin injury. The physicals were required for OSU football players, and John Doe 83 was never given an option to see anyone other than Dr. Strauss.

463.     The physical exams occurred at the Woody Hayes facility during the football

team's scheduled physical exam days. Dr. Strauss and John Doe 83 were alone for the physical exams.

464.    John Doe 83's first physical exam with Dr. Strauss was in the fall of 1989. John Doe 83 had one physical exam with Dr. Strauss every year until John Doe 83 graduated in 1993.

465.    At each physical exam, Dr. Strauss told John Doe 83 to stand up and remove all of his clothing. At each exam, Dr. Strauss stroked John Doe 83's genitalia for an extended period of time. Dr. Strauss did not wear gloves during some of the physical exams.

466.    During the 1989 to 1990 school year, Dr. Strauss examined John Doe 83 one to two times after he suffered a groin injury. Dr. Strauss again stroked John Doe 83's genitals for a prolonged period when examining him.

467.    John Doe 83 felt confused and embarrassed by Dr. Strauss' behavior.

468.    John Doe 83 often heard his teammates make jokes about Dr. Strauss' exams, joking that student-athletes should be prepared for an uncomfortable experience.

469.    When John Doe 83 was a student-athlete at OSU, he frequently saw Dr. Strauss linger in the student-athlete hot tub area where he and many of the football players would be naked. Students joked about Dr. Strauss' tendency to linger in the area, saying "He's hanging around again." The students made these jokes and comments within earshot of OSU trainers.

470.    John Doe 83 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

471.    While John Doe 83 was an OSU student, he trusted that OSU would not allow him to be harmed.

472.    John Doe 83 reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss'
examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss'
examinations and treatments, John Doe 83 did not understand or believe that Dr. Strauss had
sexually abused him.

473.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John
Doe 83 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive
conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor
did he have reason to investigate whether OSU had harmed him.

474.    Even if, while he was an OSU student, John Doe 83 had tried to inquire into
OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU
controlled access to that information.

475.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial
sexual abuse of OSU students, John Doe 83 did not know, or have reason to know, that Dr.
Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or
that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

476.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual
abuse, John Doe 83 would not have been abused by Dr. Strauss.

477.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 83 has
suffered physical, emotional, and psychological damages. He experiences anxiety when he thinks
about the abuse. John Doe 83 has refused to be treated by male physicians as a result. He is also
frustrated and angry at OSU for allowing the abuse to happen. He is worried about his children
and fears that they might have a similar experience with a doctor. He insists on being present at
his son's medical appointments and asks his children's doctors many questions. He continues to

feel anxiety when his children have medical appointments.

## JOHN DOE 84

478.　John Doe 84 was a student at OSU from 1988 to 1997 and a member of the OSU football team from 1988 to 1993.

479.　From 1988 to 1989, while a student at OSU, John Doe 84 was abused by Dr. Strauss during two physical exams. He was nineteen years old at the time that he was first abused.

480.　John Doe 84 was recruited to OSU to compete on its football team and received a full athletic scholarship for football. He was a redshirt from 1988 to 1989 then formally competed on the OSU football team from 1989 to 1993. He was required to undergo a physical exam with Dr. Strauss during his freshman and sophomore years as part of his participation on the football team.

481.　The OSU football coaches told John Doe 84 that the physical exams were required in order for him to compete on the football team. An OSU employee scheduled John Doe 84's two physical exam appointments with Dr. Strauss, which took place at the Woody Hayes Athletic Center.

482.　At the beginning of the first exam, Dr. Strauss told John Doe 84 to drop his pants. John Doe 84 complied. John Doe 84 and Dr. Strauss were alone in the exam room.

483.　Dr. Strauss then said he was performing a hernia check. Dr. Strauss aggressively touched and squeezed John Doe 84's penis and testicles for a prolonged period of time.

484.　John Doe 84 was required to attend an additional physical exam with Dr. Strauss the following year to compete on the OSU football team. This subsequent exam proceeded in the same manner as the first exam—Dr. Strauss fondled John Doe 84's penis and testicles for a

prolonged period of time.

485.    Eventually, Dr. Strauss ended the exam and instructed John Doe 84 to get dressed. John Doe 84 does not recall Dr. Strauss saying anything regarding the exam or its results. Dr. Strauss did not wear gloves at any time during the exams.

486.    John Doe 84 felt concerned and uncomfortable during the exams.

487.    John Doe 84 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

488.    While John Doe 84 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examination, John Doe 84 did not understand or believe that Dr. Strauss had sexually abused him.

489.    John Doe 84 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

490.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 84 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

491.    Even if, while John Doe 84 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

492.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 84 did not know, or have reason to know, that Dr.

Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

493. If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 84 would not have been abused by Dr. Strauss.

494. As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 84 has suffered physical, emotional, and psychological damages. John Doe 84 is leery of men who are over friendly. He is apprehensive of doctors and avoids seeking medical attention. He has anxiety and stress concerning his children who play sports and need to undergo physicals. He feels it is imperative to attend his children's physicals and be in the room with them to prevent doctors from doing inappropriate things.

## JOHN DOE 85

495. John Doe 85 was a student at OSU from 1985 to 1991, and was a member of the OSU basketball team from 1985 to 1989. He attended on a full athletic scholarship.

496. John Doe 85 relied on his scholarship to attend college.

497. While a student at OSU, John Doe 85 was examined by Dr. Strauss four times from 1985 to 1987 at OSU's Woody Hayes facility.

498. John Doe 85 visited the center for four exams to obtain treatment for STIs. During each visit, John Doe 85 was alone in the exam room with Dr. Strauss.

499. At the first exam in late 1985, Dr. Strauss instructed John Doe 85 to remove his pants and underwear and lay down on the exam table. Dr. Strauss then engaged in prolonged fondling of John Doe 85's genitals. He moved John Doe 85's penis and testicles around in different directions—up, down, left, right.

500. John Doe 85 had three follow-up exams with Dr. Strauss from 1985 to 1987. Each

exam proceeded in the same manner as the first.

501. Dr. Strauss' conduct during the exams made John Doe 85 uncomfortable, but he was afraid to say anything because he needed Dr. Strauss' help in treating his STI. He did not realize that Dr. Strauss was sexually abusing and harassing him.

502. While he was a student at OSU, John Doe 85 did not know what to do about Dr. Strauss' conduct. He was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

503. While John Doe 85 was an OSU student, he trusted that OSU would not allow him to be harmed.

504. John Doe 85 reasonably believed that that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. He trusted that OSU would not employ a sexual abuser. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 85 believed they were legitimate medical examinations and he did not understand or believe that Dr. Strauss had sexually abused him.

505. Until learning about OSU's 2018 investigation into Dr. Strauss, John Doe 85 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

506. Even if, while John Doe 85 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

507. In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 85 did not know, or have reason to know, that Dr.

Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

508.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 85 would not have been abused by Dr. Strauss.

509.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 85 has suffered physical, emotional, and psychological damages. He feels anger at OSU for allowing Dr. Strauss to abuse him. He also feels stress and anxiety from his memories of his exams with Dr. Strauss.

## JOHN DOE 86

510.    John Doe 86 was a student at OSU from 1988 to 1994, and a member of OSU's football team during that period. John Doe 86 attended OSU on a full athletic scholarship.

511.    John Doe 86 relied on his scholarship to attend college.

512.    While a student at OSU, John Doe 86 saw Dr. Strauss for five annual pre-season physicals, as well as on one additional occasion for treatment of a STD.

513.    As a member of OSU's football team, John Doe 86 was required to have a pre-season physical.

514.    John Doe 86 met with Dr. Strauss at an OSU facility.

515.    During each or nearly each physical exam and treatment, Dr. Strauss grabbed and manipulated John Doe 86's penis and scrotum for a prolonged and extended time.

516.    John Doe 86 did not realize that Dr. Strauss was sexually abusing and harassing him.

517.    While he was a student at OSU, John Doe 86 did not know what to do about Dr. Strauss' conduct and he felt that he was not in a position to do anything.

518.    John Doe 86 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

519.    While John Doe 86 was an OSU student, he trusted that OSU would not allow him to be harmed.

520.    John Doe 86 reasonably believed that that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 86 believed they were legitimate medical examinations and he did not understand or believe that Dr. Strauss had sexually abused him.

521.    Until learning about OSU's 2018 investigation into Dr. Strauss, John Doe 86 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

522.    Even if, while John Doe 86 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

523.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 86 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

524.    If OSU had taken meaningful action to address Dr. Strauss' inappropriate behavior as observed by OSU employees, John Doe 86 would not have been abused by Dr.

Strauss.

525.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 86 has suffered physical, emotional, and psychological damages. He also feels betrayed by OSU; he considers himself a proud OSU alumni and OSU football fan, and he is disheartened that an institution he loves did not act to protect its students from Dr. Strauss.

## **JOHN DOE 87**

526.    John Doe 87 was a student at OSU from 1982 to 1988, and a member of OSU's gymnastics team from 1982 to 1986. John Doe 87 was given a partial athletic scholarship.

527.    John Doe 87 relied on his scholarship to attend college.

528.    Dr. Strauss examined John Doe 87 during four annual gymnastics physicals. Dr. Strauss also treated John Doe 87 for a gymnastics injury he had in his junior year at OSU.

529.    The OSU gymnastics team required John Doe 87 and the other team members to be examined by Dr. Strauss for annual physicals to confirm medical eligibility to play on the team.

530.    During each required annual physical, Dr. Strauss acted in the same way: He instructed John Doe 87 to completely undress. Then, while Dr. Strauss sat on a stool and John Doe 87 was standing, Dr. Strauss examined John Doe 87's genitals. Dr. Strauss' face would be mere inches from John Doe 87's genitals. Dr. Strauss then manipulated and groped John Doe 87's penis and testicles for a prolonged period of time.

531.    During John Doe 87's junior year at OSU, John Doe 87 injured his ankle during gymnastics practice. John Doe 87 saw Dr. Strauss approximately four times to treat the injury.

532.    At approximately the third visit to treat the ankle injury, Dr. Strauss asked John Doe 87 whether he was sexually active with his girlfriend. When John Doe 87 responded that he

was, Dr. Strauss said he was obligated to examine him for STDs, even though John Doe 87 had only sought treatment for an ankle injury. Dr. Strauss explained at this or the subsequent appointment that he was obligated to evaluate John Doe 87 for STDs to avoid the spread of any such STDs because John Doe 87 shared common spaces with other gymnasts. Dr. Strauss then stared at John Doe 87's penis and testicles while he manipulated and groped them for a prolonged period of time. Dr. Strauss did not indicate that he saw any signs of an STD.

533.     In the next appointment to treat John Doe 87's injured ankle, Dr. Strauss said he needed to examine John Doe 87's genitals again and needed to obtain a sample for testing. He said he had a technique to get the sample and stroked John Doe 87's penis. Dr. Strauss did not explain what his technique was or what type of sample he needed; John Doe 87 believed Dr. Strauss was attempting to masturbate him to ejaculation. John Doe 87 became uncomfortable and told Dr. Strauss he wanted to stop the STD examination and would reschedule for another time. Dr. Strauss told him that he would not reveal to the gymnastics coaches that John Doe 87 still had to complete the STD exam; in retrospect, John Doe 87 believes this was an attempt to manipulate John Doe 87 into silence. John Doe 87 left the appointment shaken and never followed up with Dr. Strauss.

534.     Dr. Strauss never wore gloves during any of the exams.

535.     John Doe 87 witnessed that Dr. Strauss was often in the Larkins Hall locker room and shower area after gymnastics practice. Dr. Strauss showered with members of the gymnastic team, including John Doe 87, and lingered in the locker room to take multiple showers a day with different gymnasts. Dr. Strauss stared at the gymnasts as they undressed and showered, in full view of the gymnastics coaches, staff, and team members.

536.     When John Doe 87 was a freshman, Dr. Strauss leered at John Doe 87 in the

locker area and stared at his naked body. After John Doe 87 experienced being leered at by Dr. Strauss in the locker area early in his freshman year at OSU, John Doe 87 stopped showering in the Larkins Hall locker room to avoid Dr. Strauss and returned to his own apartment to shower.

537.    Gymnasts discussed that Dr. Strauss seemed to take multiple showers daily; they would uncomfortably laugh it off. John Doe 87 believes the gymnastics coaches must have known that Dr. Strauss lingered in the showers and locker room, because the coaches were regularly in the locker rooms and Dr. Strauss' presence was frequent and obvious.

538.    Dr. Strauss regularly took photos of John Doe 87 and other gymnasts at the Larkins gymnastics gym. During John Doe 87's senior year, Dr. Strauss gave John Doe 87 photographs of John Doe 87 shirtless; John Doe 87 had been unaware that Dr. Strauss had taken those photographs.

539.    Dr. Strauss' exams made John Doe 87 feel uncomfortable, embarrassed, and ashamed. He believed there was nothing he could do, as Dr. Strauss was the team doctor and was "in charge."

540.    John Doe 87 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

541.    While John Doe 87 was an OSU student, he trusted that OSU would not allow him to be harmed.

542.    John Doe 87 reasonably believed that that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 87 believed they were legitimate medical examinations and he did not

understand or believe that Dr. Strauss had sexually abused him.

543.    Until learning about OSU's 2018 investigation into Dr. Strauss, John Doe 87 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

544.    Even if, while John Doe 87 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

545.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 87 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

546.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 87 would not have been abused by Dr. Strauss.

547.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 87 has suffered physical, emotional, and psychological damages. While on the OSU gymnastics team, John Doe 87 was uncomfortable and stressed when he knew he would have to be examined by Dr. Strauss. At times he did not seek necessary medical treatment for gymnastic injuries to avoid being examined by Dr. Strauss. After he graduated from OSU, John Doe 87 avoided seeking medical treatment for years as a result of his experiences with Dr. Strauss. As a result of those experiences, John Doe 87 became anxious with gay men, which he did not feel prior to his time at OSU. He has overcome that homophobia but in the past it created tensions in his life.

**JOHN DOE 88**

548.    John Doe 88 was a student at OSU from 1992 to 1997, and a member of OSU's football team during that period. John Doe 88 attended OSU on a full athletic scholarship.

549.    John Doe 88 relied on his scholarship to attend college.

550.    While a student at OSU, John Doe 88 saw Dr. Strauss for three annual pre-season physicals, as well as on two to three additional occasions for treatment of football injuries.

551.    As a member of OSU's football team, John Doe 88 was required to have a pre-season physical.

552.    John Doe 88 met with Dr. Strauss at an OSU facility.

553.    During each of the physical exams, as well as the treatments for football injuries, Dr. Strauss followed the same pattern. Each time Dr. Strauss instructed John Doe 88 to pull down his trousers and instructed John Doe 88 to stand in front of Dr. Strauss, who would sit on a stool. Then, each time, Dr. Strauss manipulated John Doe 88's penis and testicles for a prolonged period of time, moving his penis in all directions and groping his testicles. Each time Dr. Strauss caused John Doe 88's penis to become at least partially erect; during two physical exams he became fully erect.

554.    Coaches, including Coach Pegues, had a standing joke that the football players should not be in the examination room with Dr. Strauss for too long. John Doe 88's teammates had similar experiences with Dr. Strauss and made light of their experiences, saying, "You should get out of the physical quick." His teammates often made these statements in front of trainers and coaches.

555.    John Doe 88 also saw Dr. Strauss at times in the locker room and showers for the football team, staring at football players, including John Doe 88, in various states of undress and

showering with the athletes. On at least two occasions Dr. Strauss took a shower while John Doe 88 was showering.

556.    His teammates also joked about Dr. Strauss' presence in the locker room and showers. John Doe 88 did not realize that Dr. Strauss was sexually abusing and harassing him.

557.    John Doe 88 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

558.    While John Doe 88 was an OSU student, he trusted that OSU would not allow him to be harmed.

559.    John Doe 88 reasonably believed that that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 88 believed they were legitimate medical examinations and he did not understand or believe that Dr. Strauss had sexually abused him.

560.    Until learning about OSU's 2018 investigation into Dr. Strauss, John Doe 88 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

561.    Even if, while John Doe 88 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

562.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 88 did not know, or have reason to know, that Dr.

Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

563.    If OSU had taken meaningful action to address Dr. Strauss' inappropriate behavior as observed by OSU employees, John Doe 88 would not have been abused by Dr. Strauss.

564.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 88 has suffered physical, emotional, and psychological damages. Dr. Strauss' conduct distracted him from his focus on football. Instead of concentrating on learning his football playbook, John Doe 88 would be thinking about Dr. Strauss' conduct, which impacted John Doe 88's ability to perform at the highest levels on the field and impacted his football career prospects. John Doe 88 began using marijuana to self-medicate after Dr. Strauss' conduct; he had not previously been a marijuana user. As a result, John Doe 88 failed an OSU football team drug test and had to undergo mandatory psychological treatment. The psychologist probed whether John Doe 88's marijuana use stemmed from something in his childhood, which made John Doe 88 uncomfortable, as the true reason was Dr. Strauss' conduct. But John Doe 88 did not feel comfortable revealing Dr. Strauss' conduct to the psychologist, especially as he understood the psychologist would not keep the information confidential. Instead, John Doe 88 chose not to be treated by the psychologist and missed his next appointment. As a result of missing the psychologist's appointment, John Doe 88 was pulled from the starting line-up. John Doe 88 distrusts doctors because of his experiences with Dr. Strauss. As a result, he has been treated at the same medical facility, though it is inconvenient and not near his home, to avoid seeking out new doctors; at times, he has avoided seeking care even from the doctors he trusts. He is cautious and distrustful when his son needs medical care; he has had challenging conversations with his

son to protect him from abusive doctors. He has had flashbacks to Dr. Strauss' examinations during sexual interactions, negatively affecting those sexual relationships. He also feels betrayed by OSU; he considers himself a proud OSU alumnus and football fan, and he is disheartened that an institution he loves did not act to protect its students from Dr. Strauss.

### <u>JOHN DOE 89</u>

565.    John Doe 89 was an undergraduate student at OSU from 1987 to 1992 and a member of the OSU football team during that time.

566.    From 1987 to 1992, while a student at OSU, John Doe 89 was abused by Dr. Strauss during at least five physical exams and one medical appointment. He was eighteen years old at the time that he was first abused.

567.    John Doe 89 was recruited to OSU to compete on its football team and received a full athletic scholarship for football. He relied on his scholarship to attend OSU. He was a redshirt from 1987 to 1988 then formally competed on the OSU football team from 1988 to 1992.

568.    The OSU football coaches told John Doe 89 that the physical exam was required in order for him to compete on the football team. An OSU employee scheduled John Doe 89's five physical exam appointments with Dr. Strauss, which took place at the Woody Hayes Athletic Center and Larkins Hall.

569.    At the beginning of the first exam, Dr. Strauss told John Doe 89 to get completely undressed and sit at the edge of the exam table. John Doe 89 complied. John Doe 89 and Dr. Strauss were alone in the exam room.

570.    Dr. Strauss then sat on a stool between John Doe 89's legs and lowered his face to John Doe 89's genital region. Dr. Strauss aggressively touched and squeezed John Doe 89's

penis and testicles for a prolonged period of time, causing an erection.

571.    John Doe 89 felt uncomfortable during the exam.

572.    Eventually, Dr. Strauss ended the exam and instructed John Doe 89 to get dressed. He did not wear gloves at any time during the exam.

573.    John Doe 89 was required to attend at least four additional physical exams with Dr. Strauss to compete on the OSU football team. Each exam proceeded in the same manner as the first exam—Dr. Strauss fondled John Doe 89's penis and testicles for a prolonged period of time and stroked his penis to erection.

574.    Dr. Strauss also showered in the locker room when the team, including John Doe 89, was showering. John Doe 89's teammates complained to coaches and amongst each other that it was odd and that Dr. Strauss should not be showering in the team facilities. They also complained to coaches and amongst each other about Dr. Strauss' exams.

575.    Dr. Strauss' exams and his presence in the showers made John Doe 89 uncomfortable and was a topic of conversation among his teammates. John Doe 89 believed he just had to get used to it, as none of his coaches stopped Dr. Strauss' behavior despite being aware of teammates' concerns regarding Dr. Strauss and his behavior.

576.    On one occasion, John Doe 89 had a medical appointment with Dr. Strauss to treat a possible STD. A member of the OSU football staff scheduled John Doe 89's medical appointment with Dr. Strauss when John Doe 89 said he needed medical attention for a possible STD.

577.    The medical appointment with Dr. Strauss began in the same manner as John Doe 89's physical exams. After instructing John Doe 89 to undress, Dr. Strauss began fondling John Doe 89's penis and testicles. Dr. Strauss stroked John Doe 89's penis for a prolonged period of

time; however, this time John Doe 89 did not get an erection. Dr. Strauss was not wearing gloves.

578.    After Dr. Strauss ceased fondling John Doe 89, he told John Doe 89 that he needed to perform a prostate exam as part of the STD examination. Dr. Strauss put on gloves, used lubrication, and inserted his finger into John Doe 89's anus for a prolonged period of time.

579.    After performing the prostate exam, Dr. Strauss administered a shot in John Doe 89's buttocks and then did not say anything to John Doe 89 regarding the exam or subsequent treatment.

580.    John Doe 89 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

581.    While John Doe 89 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examination, John Doe 89 did not understand or believe that Dr. Strauss had sexually abused him. Further, student-athletes openly joked in front of OSU football staff about Dr. Strauss' examinations and his lingering in the showers; yet, the football coaches continued to require John Doe 89 and other athletes to see Dr. Strauss for examinations and treatment.

582.    John Doe 89 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

583.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 89 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss'

abuse. Nor did he have reason to investigate whether OSU had harmed him.

584. Even if, while John Doe 89 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

585. In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 89 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

586. If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 89 would not have been abused by Dr. Strauss.

587. As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 89 has suffered physical, emotional, and psychological damages. When thinking about his interactions with Dr. Strauss and the betrayal he suffered at the hands of OSU, John Doe 89 feels anger, shame, and disbelief. For many years John Doe 89 had trouble forming lasting trusting romantic relationships prior to marriage. John Doe 89 is distrustful of physicians and avoids doctor visits, often skipping them, and for many years he never went to a single doctor appointment. He is anxious when his children have doctor appointments and never lets them go alone.

### **JOHN DOE 90**

588. John Doe 90 was an undergraduate student at OSU from 1985 to 1990 and trained off-season with members of the OSU soccer team.

589. In the spring of 1987, while a student at OSU, John Doe 90 was abused by Dr. Strauss during a medical appointment. He was nineteen years old at the time that he was abused.

590. John Doe 90 trained with members of the OSU soccer team but was not a member of the team. While playing soccer, he injured his ankle and hamstring.

591.    John Doe 90 contacted OSU Student Health and they scheduled an appointment with Dr. Strauss.

592.    At the beginning of the exam, Dr. Strauss gave John Doe 90 a cursory look and then told him to stand up. Dr. Strauss then told John Doe 90 that he wanted to do a complete exam and check John Doe 90 for a hernia to make sure everything was working properly. Dr. Strauss told John Doe 90 to drop his pants. John Doe 90 and Dr. Strauss were alone in the exam room.

593.    Dr. Strauss sat on a stool in front of John Doe 90 who was standing. Dr. Strauss lowered his face near John Doe 90's genital region. Dr. Strauss began fondling John Doe 90's genitals. He stroked, massaged, and masturbated John Doe 90's penis for a prolonged period of time, causing his penis to become erect. John Doe 90 became uncomfortable and pulled away, pulled up his pants and left the exam room.

594.    Dr. Strauss was not wearing gloves at any time during the exam.

595.    John Doe 90 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

596.    While John Doe 90 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 90 did not understand or believe that Dr. Strauss had sexually abused him.

597.    John Doe 90 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

598.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct and

seeing Dr. Strauss' picture on the news, John Doe 90 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

599.    Even if, while John Doe 90 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

600.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 90 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

601.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 90 would not have been abused by Dr. Strauss.

602.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 90 has suffered physical, emotional, economic, and psychological damages. Following the exam, and as a result of John Doe 90's stress related to the exam, John Doe 90's grades declined significantly to the point that he dropped out of school in 1988. He returned to school later and his grades improved, but he was not able to graduate and left school for good in 1990. He feels shame, anxiety, and disgust. He feels ongoing stress when he thinks about what he went through and how OSU did not prevent it. For years after the exam, John Doe 90 had flashbacks and visceral, intense thoughts about the exam, which faded away over time until the last few years when the story surfaced in the news. Dr. Strauss' abuse made him question his sexuality. Further, John Doe 90 avoids doctor visits, often skipping them, and for many years he never went to a single

doctor appointment. He is anxious when his children have doctor appointments.

## **JOHN DOE 91**

603.     John Doe 91 was an undergraduate student at OSU from 1991 through 1996.

604.     John Doe 91 was recruited to OSU to compete on its football team. He competed on the team from 1991 to 1996.

605.     The OSU football coaching staff told John Doe 91 that he was required to get pre-season physicals from Dr. Strauss to participate on the football team with a full athletic scholarship. John Doe 91 underwent these pre-season physical exams with Dr. Strauss in the fall of 1991, 1992, 1993, and 1994.

606.     John Doe 91 felt he did not have any choice but to see Dr. Strauss, since it was a condition for participating on the football team.

607.     John Doe 91 received his first pre-season physical from Dr. Strauss in 1991, when John Doe 91 was eighteen years old.

608.     During that first physical, which was conducted in a private exam room at Larkins Hall or the Woody Hayes Athletic Center, Dr. Strauss told John Doe 91 to take off his clothes. While John Doe 91 stood in the exam room, Dr. Strauss was sitting on a stool in front of John Doe 91. Dr. Strauss began to fondle, pull, and grab at both John Doe 91's penis and testicles for a prolonged period of time. Dr. Strauss' fondling made John Doe 91 feel uncomfortable to the point that he began to squirm. At that point, Dr. Strauss told him, with a scowl, to relax. When John Doe 91 continued to appear uncomfortable, Dr. Strauss eventually ended the exam.

609.     John Doe 91 was required to attend at least three additional physical exams with Dr. Strauss to compete on the OSU football team. Each exam proceeded in the same manner as the first exam—Dr. Strauss fondled John Doe 91's penis and testicles for a prolonged period of

time, and after John Doe 91 expressed his discomfort Dr. Strauss eventually ended the exam.

610.    John Doe 91 saw Dr. Strauss on at least one other occasion while he was on the football team—for a back injury suffered during the 1994 football season. The exam took place in a private exam room in Larkins Hall or at the Woody Hayes Athletic Center.

611.    During this exam, Dr. Strauss insisted that it was necessary to perform a hernia exam and rectal exam. Dr. Strauss, without gloves, told John Doe 91 he was performing the hernia exam and fondled John Doe 91's genitals for a prolonged period of time. Dr. Strauss then inserted his ungloved finger into John Doe 91's rectum. It was then that John Doe 91 observed that Dr. Strauss had an erection. John Doe 91, angered and uncomfortable, terminated the exam.

612.    Following this exam, John Doe 91 decided he would never see Dr. Strauss again for any injury, and that he would rather play injured than be forced to see Dr. Strauss again.

613.    During John Doe 91's time at OSU, he talked with other teammates about Dr. Strauss, and they gave accounts of exams similar to his. His teammates made joking comments and told stories about Dr. Strauss. The football players' nickname for Dr. Strauss was "the nut grabber." OSU football staff were present times during many such conversations and instructed players to just get in and get out.

614.    John Doe 91 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

615.    While John Doe 91 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 91 did not understand or believe that Dr. Strauss had sexually abused him.

616.    John Doe 91 reasonably believed that OSU would not have made Dr. Strauss the

athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss'
examinations were legitimate.

617.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John
Doe 91 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive
conduct or that other student-athletes had previously complained to OSU about Dr. Strauss'
abuse. Nor did he have reason to investigate whether OSU had harmed him.

618.    Even if, while John Doe 91 was an OSU student, he had tried to inquire further
into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled
access to that information.

619.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial
sexual abuse of OSU students, John Doe 91 did not know, or have reason to know, that Dr.
Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or
that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

620.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual
abuse, John Doe 91 would not have been abused by Dr. Strauss.

621.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 91 has
suffered physical, emotional, and psychological damages. He developed an alcohol abuse
problem after the interactions with Dr. Strauss that he has never fully recovered from. He feels
anger, stress, and frustration at OSU for not protecting him from Dr. Strauss. He feels stress and
anxiety when he thinks of his college years. Dr. Strauss' abuse has affected his sexual and
romantic relationships, making him feel uncomfortable sexually and undeserving of love. Until
his recent stroke, he refused to visit the doctor even to have his blood pressure checked, a likely
contributing factor that led to his stroke. He experiences fear and anxiety even now when it is

necessary to visit the doctor.

## JOHN DOE 92

622.    John Doe 92 was a student at OSU between 1988 and 1993, and a member of OSU's football team from 1988 through 1992.

623.    John Doe 92 was a walk-on football player. He received a full football scholarship during his fourth and fifth season at OSU and relied on that scholarship to attend college.

624.    OSU staff required John Doe 92 to see Dr. Strauss for his required annual physical examination during his first four years on the football team.

625.    Dr. Strauss conducted John Doe 92's first, second, and fourth required annual physical (i.e., during his freshman, sophomore, and senior years) in the same manner. Each time, Dr. Strauss instructed John Doe 92 to disrobe completely. While John Doe 92 was standing, Dr. Strauss sat on a stool. Each time, Dr. Strauss was eye level with John Doe 92's genitals with his face very close to John Doe 92's genitals. Each time, Dr. Strauss then rubbed and stroked John Doe 92's testicles separately for a prolonged period on each side; he then manipulated John Doe 92's penis for a prolonged time.

626.    During John Doe 92's third required annual physical (i.e., during his junior year), Dr. Strauss told John Doe 92 to disrobe and manipulated his testicles and penis for a prolonged period of time, as Dr. Strauss had done during the two previous physicals. Dr. Strauss also instructed John Doe 92 to turn around, bend over, and spread his buttocks with his hands. After John Doe 92 complied, Dr. Strauss examined John Doe 92's anus with a flashlight.

627.    Many upperclassmen on the football team refused to see Dr. Strauss for their annual physicals. OSU football trainers knew that upperclassmen routinely refused to see Dr. Strauss.

628.    During John Doe 92's fourth year at OSU, he considered refusing to see Dr. Strauss for his annual physical because Dr. Strauss' exams made him uncomfortable. But John Doe 92 feared he would be risking his chance at receiving a football scholarship if he refused to undergo the required physical exam by Dr. Strauss. As a result, John Doe 92 saw Dr. Strauss for his fourth annual physical, as described above.

629.    By John Doe 92's fifth and final year on the team, John Doe 92 had received a football scholarship and believed he had enough clout on the team that he would not face repercussions from the coaching staff if he refused to see Dr. Strauss. John Doe 92 did not see Dr. Strauss for his final annual physical. All of Dr. Strauss' examinations of John Doe 92 occurred in Woody Hayes.

630.    Dr. Strauss' exams made John Doe 92 feel uncomfortable, embarrassed, and ashamed, but John Doe 92 did not realize that Dr. Strauss' exams were sexually abusive.

631.    John Doe 92's teammates had similar experiences with Dr. Strauss. They made light of their experiences and joked about the exams, often in front of trainers.

632.    John Doe 92 and other OSU football players commonly referred to Dr. Strauss as "Mr. Ice Cold" because his hands were always so cold on the athletes' genitals. They also described Dr. Strauss as "the weird dude," and "the handsy guy." John Doe 92 and his teammates would say "I got got" after being examined by Dr. Strauss. The trainers heard these comments and brushed them aside; they never took any of the remarks seriously.

633.    John Doe 92 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

634.    While John Doe 92 was an OSU student, he trusted that OSU would not allow

him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, he reasonably believed that Dr. Strauss' behavior was part of a legitimate medical examination and did not understand or believe that Dr. Strauss had sexually abused him.

635.    This is because, while John Doe 92 attended OSU, student-athletes openly joked about Dr. Strauss' examinations in front of OSU staff, and John Doe 92 reasonably believed that OSU would not have required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

636.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 92 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU—in addition to Dr. Strauss—had harmed him.

637.    Even if, while John Doe 92 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

638.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 92 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

639.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 92 would not have been abused by Dr. Strauss.

640.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 92 has suffered physical, emotional, and psychological damages. John Doe 92 felt that he had no power to refuse to see Dr. Strauss, which compounded his feeling that he was "second class" as a walk-

on athlete. John Doe 92 saw a sports psychologist while at OSU, in part to address the stress he felt from Dr. Strauss' examinations, but John Doe 92 was too embarrassed to tell the psychologist about Dr. Strauss' conduct. As a result of Dr. Strauss' abuse, John Doe 92 has distrusted doctors and avoided medical exams, particularly exams by male doctors. He has not had a physical examination in over five years. He fears for his daughters when they need medical treatment or physical examinations. When his daughters were younger, he always insisted on accompanying them to medical appointments. He has anxiety that men will take advantage of his wife and daughters. He works to make sure authority figures like teachers or doctors believe that his daughters are not vulnerable to abuse. For example, he engages in specific dialogue with his daughters in front of such teachers or doctors to demonstrate that his daughters will come to him and reveal any mistreatment.

## JOHN DOE 93

641.    John Doe 93 was an undergraduate student at OSU from 1988 to 1995 and a member of the OSU basketball team for the 1988 to 1989 season.

642.    During the 1988 to 1989 basketball season, while a student at OSU, John Doe 93 was abused by Dr. Strauss during a physical exam. He was nineteen years old at the time that he was first abused.

643.    John Doe 93 was a walk-on at OSU's basketball team and received a partial academic scholarship to attend OSU.

644.    The OSU basketball coaches/staff told John Doe 93 that the physical exam was required in order for him to compete on the basketball team. Since John Doe 93 was a walk-on athlete, he was told that he would have to get a physical exam separate from the team. An OSU employee scheduled John Doe 93's physical exam appointment with Dr. Strauss, which took

place at Larkins Hall.

645.    At the beginning of the physical exam, Dr. Strauss told John Doe 93 to take off his pants and stand. John Doe 93 complied. John Doe 93 and Dr. Strauss were alone in the exam room.

646.    Dr. Strauss then sat on a stool in front of John Doe 93 who remained standing. Dr. Strauss scooted in close to John Doe 93's genital region. He fondled John Doe 93's penis and testicles. He repeatedly stroked John Doe 93's penis and lifted John Doe 93's testicles for a prolonged period of time.

647.    John Doe 93 felt uncomfortable during the exam.

648.    Eventually, Dr. Strauss ended the exam and instructed John Doe 93 to get dressed. He did not wear gloves at any time during the exam.

649.    John Doe 93 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

650.    While John Doe 93 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examination, John Doe 93 did not understand or believe that Dr. Strauss had sexually abused him.

651.    John Doe 93 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

652.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 93 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss'

abuse. Nor did he have reason to investigate whether OSU had harmed him.

653.    Even if, while John Doe 93 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

654.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 93 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

655.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 93 would not have been abused by Dr. Strauss.

656.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 93 has suffered physical, emotional, and psychological damages. John Doe 93 decided not to play basketball at OSU again after his freshman year, in part because he wanted to avoid Dr. Strauss. He has battled depression, stress, and anxiety caused by his interactions with Dr. Strauss, and has been prescribed anti-depressant and anti-anxiety medication. The news in the last few years about Dr. Strauss' abuse has exacerbated his depression and anxiety. John Doe 93 was distrustful of and uncomfortable around doctors for years until finally finding his current doctor.

**<u>JOHN DOE 94</u>**

657.    John Doe 94 was an undergraduate student at OSU from 1988 to 1991 and a member of the OSU football team.

658.    While a student at OSU, John Doe 94 was abused by Dr. Strauss during at least two physical exams and two medical appointments. He was eighteen years old at the time that he was first abused.

659. John Doe 94 was recruited to OSU to compete on its football team and received a full athletic scholarship for football. He relied on his athletic scholarship to attend school. He competed on the OSU football team from 1988 to 1991. He was required to undergo a physical exam with Dr. Strauss at least twice as part of his participation on the football team.

660. The OSU football coaches told John Doe 94 that the physical exam was required in order for him to compete on the football team. OSU football team staff scheduled John Doe 94's two required physical exams and two medical appointments with Dr. Strauss, which took place at the Woody Hayes Athletic Center.

661. John Doe 94 was required to attend at least two physical exams with Dr. Strauss to compete on the OSU football team. The first exam took place his freshman year. Each exam proceeded in the same manner. During both exams, Dr. Strauss fondled John Doe 94's penis and testicles for a prolonged period of time under the guise of performing a hernia check. He also inserted his finger into John Doe 94's anus on both occasions. Dr. Strauss did not wear gloves during these two exams.

662. John Doe 94 felt uncomfortable during these exams.

663. John Doe 94's first interaction with Dr. Strauss outside of a physical exam came during his sophomore year. John Doe 94 had injured his shoulder while playing football for OSU. OSU football staff sent him to Dr. Strauss for treatment. Dr. Strauss told John Doe 94 to get completely undressed and sit at the edge of the exam table. John Doe 94 complied. John Doe 94 and Dr. Strauss were alone in the exam room. Strauss aggressively touched and squeezed John Doe 94's penis and testicles for a prolonged period of time. John Doe 94 asked Dr. Strauss what that had to do with his shoulder. Dr. Strauss threatened that "you might not want to act like that or you won't be around here for long."

664. John Doe 94's second medical appointment was for the same shoulder injury later during John Doe 94's sophomore year. Again, Dr. Strauss instructed John Doe 94 to take off all his clothes and began fondling John Doe 94's genitals for a prolonged period of time. Then Dr. Strauss abruptly stopped fondling John Doe 94 without explanation. Dr. Strauss wore gloves during the first medial appointment, but not the second.

665. John Doe 94 felt uncomfortable during these medical appointments.

666. John Doe 94 observed Dr. Strauss at the edge of the men's showers fully clothed, watching John Doe 94 and his teammates shower at least four to six times a year.

667. Dr. Strauss' exams and his presence in the showers made John Doe 94 uncomfortable and was a topic of conversation among his teammates.

668. During the required annual football team physicals, the team would line up and be sent to various OSU doctors in order. The upperclassman on John Doe 94's football team had a running joke where they would count up the number of people and try to estimate who would get Dr. Strauss and then would offer up spots in line so as to avoid Dr. Strauss. OSU coaches and personnel were in the waiting area observing the line jostling as it was taking place.

669. John Doe 94's teammates would also use terms like "freak," "into freaky shit," and ask "what's up with him?" when referring to Dr. Strauss. OSU coaches and personnel were in the areas where the teammates were making these comments. The general approach among John Doe 94 and his teammates was to joke about Dr. Strauss' exams, treat them as something that needed to be endured, and simply try to avoid Dr. Strauss when possible.

670. John Doe 94 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

671.    While John Doe 94 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 94 did not understand or believe that Dr. Strauss had sexually abused him.

672.    John Doe 94 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

673.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 94 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

674.    Even if, while John Doe 94 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

675.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 94 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

676.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 94 would not have been abused by Dr. Strauss.

677.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 94 has suffered physical, emotional, psychological, and economic damages. John Doe 94 struggled with anger, stress and frustration. As a result of the abuse his grades suffered and John Doe 94 never graduated from OSU. John Doe 94 left OSU early and pursued professional football aspirations.

John Doe 94 did not seek treatment for his shoulder to avoid Dr. Strauss. As a result, he was forced to play injured and his shoulder remains injured to this day. John Doe 94 is uncomfortable around doctors and rarely sees doctors; he has not had an annual check-up in years. When he does go for medical procedures, he ensures his wife accompanies him. Dr. Strauss' exams left John Doe 94 feeling helpless and dominated, which has caused some intimacy issues. John Doe 94 is also very protective of his children when they visit the doctor. Even when his sons, who are now adults, were in high school, John Doe 94 made sure that he attended all doctor's visits for his children.

## **JOHN DOE 95**

678.     John Doe 95 was an undergraduate student at OSU from 1985 to 1988 and a member of the OSU wrestling team.

679.     While a student at OSU, John Doe 95 was abused by Dr. Strauss during three physical exams and fifty to seventy medical exams. He was 20 years old when he was first abused.

680.     John Doe 95 transferred to OSU to compete on its wrestling team. He competed on the team from 1985 to 1988. He was required to undergo a physical exam with Dr. Strauss each fall as part of his participation on the wrestling team.

681.     The OSU wrestling coaches told John Doe 95 that the physical exam was required in order for him to compete on the wrestling team.

682.     At the beginning of the first physical exam by Dr. Strauss, in the fall of 1985, Dr. Strauss instructed John Doe 95 to take off his shirt and sit on the exam table. A woman/OSU medical team employee was in the room looking through a file cabinet when John Doe 95 first entered, but Dr. Strauss asked her to leave when he instructed John Doe 95 to take his shirt off. After John Doe 95 and Strauss were alone in the room, Dr. Strauss conducted an upper body

exam and then asked John Doe 95 to take off his shorts and lay on the exam table. John Doe 95 complied and Dr. Strauss began to examine John Doe 95's genital region, fondling, stroking and pulling on Peter' penis for a prolonged period of time. Dr. Strauss then instructed John Doe 95 to stand up and proceeded to perform a hernia check by fondling John Doe 95' testicles for a prolonged period of time.

683.    John Doe 95 was uncomfortable the entire time and began sweating due to the stress of the exam. Dr. Strauss did not use gloves during the exam.

684.    John Doe 95 was required to attend two additional physical exams with Dr. Strauss before the 1986 and 1987 wrestling seasons. The exams proceeded in the same manner as the first exam except that no other OSU personnel present were ever present at any time during the exams. Dr. Strauss did not wear gloves at these exams.

685.    Over the course of John Doe 95's three years at OSU, John Doe 95 was seen by Dr. Strauss on fifty to seventy occasions. The OSU coaches and trainers directed John Doe 95 to be examined by Dr. Strauss for any injury or treatment, or Dr. Strauss would initiate exams upon seeing John Doe 95. Dr. Strauss would spot John Doe 95 in the training room icing an injury, in the hall walking, or in a stairwell talking with a woman, and would insist on doing a full body exam for any potential injuries and/or STDs. Dr. Strauss would talk to John Doe 95 about John Doe 95's interactions with female students and stress safe sex practices and then tell John Doe 95 that he needed to do an exam. In cases where Dr. Strauss saw John Doe 95 for injury or follow-up treatment, Dr. Strauss would insist on a full physical body exam even if the injury or treatment only involved a should injury. On occasions where Dr. Strauss spotted John Doe 95 and instructed him on safe sex practices, Dr. Strauss would limit the exams to focusing on John Doe 95's genital region.

686. These fifty to seventy physical exams each proceeded in the same manner as the first exam—Dr. Strauss would require John Doe 95 to fully undress and then fondle his genitals for a prolonged period of time—except that no trainers were ever present after the first visit.

687. All of the exams occurred on OSU's campus. Most of the exams took place in Larkins Hall. Dr. Strauss would often escort John Doe 95 to a room in the basement of the building where a sliding door led to a makeshift exam room. A few of the exams, like the first, took place in the training room. At least one took place at the Student Health Center over a break.

688. Dr. Strauss never wore gloves for any of the exams.

689. On one occasion, John Doe 95 endured a head injury during wrestling that was so bad that he stumbled on the stairs on the way to the training room, causing OSU staff to call for an ambulance. Dr. Strauss seized on the opportunity the next day. Dr. Strauss required John Doe 95, still suffering from the head injury, to undergo another full physical exam at Larkins Hall training room, in the exam room. The exam proceeded in the same way as all the others, i.e. prolonged fondling of John Doe 95's genitals.

690. During John Doe 95's final year at OSU, Dr. Strauss seized on many opportunities to initiate full physical exams on John Doe 95. Following John Doe 95's knee surgery, nearly every time John Doe 95 encountered Dr. Strauss in the training room, Dr. Strauss would say things like, "Oh, your knee is red, we need to check that out."

691. During several examinations in John Doe 95's senior year, Dr. Strauss' aggressive and prolonged fondling and manipulation of John Doe 95's penis resulted in involuntary erections, that led to ejaculation. John Doe 95 apologized and Dr. Strauss said, "That's normal."

692. Dr. Strauss would talk about medical matters and injuries during the exams. He

would also ask John Doe 95 about his social and sex life by asking questions such as, "How was your weekend?" "Have you been with anyone?" "Have you been intimate with anyone?" "Did you use protection?" No matter how John Doe 95 answered these questions, Dr. Strauss would always give a reason that an exam was needed, and would say, "Let me do a quick check on you." And that check always included fondling John Doe 95's genitals for a prolonged period of time.

693.    John Doe 95 frequently saw Dr. Strauss in the team's showers. Dr. Strauss would remain in the shower area for hours while wrestlers showered. On one occasion, John Doe 95 left Larkins Hall, leaving practice a little early to attend a lab for testing that took over an hour. When John Doe 95 left Larkins Hall, Dr. Strauss was walking to the showers. When John Doe 95 returned over an hour later to do additional training, practice was over and Dr. Strauss was still in the shower staring at people. On another occasion, John Doe 95 showered after practice and Dr. Strauss was in the shower. John Doe 95 went back out to do additional training (swimming) for about an hour. When he returned, Dr. Strauss was still in the showers watching other people.

694.    Due to the number of times that Dr. Strauss would initiate medical exams for John Doe 95, other wrestlers joked with John Doe 95 asking him if he and Dr. Strauss were dating, or "Are you seeing Doc Strauss AGAIN?"

695.    While John Doe 95 did not believe he had anything to complain about at the time due to Dr. Strauss' reputation and the reasons given for each examination, John Doe 95 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him. Furthermore, John Doe 95 viewed these genital exams as a requirement or "the price of admission" to see Dr. Strauss at times when John Doe 95, himself requested a medical exam.

696.     While John Doe 95 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable and distressed during Dr. Strauss' examination, John Doe 95 did not understand or believe that Dr. Strauss had sexually abused him.

697.     John Doe 95 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

698.     Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 95 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

699.     Even if, while John Doe 95 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

700.     In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 95 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

701.     If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 95 would not have been abused by Dr. Strauss.

702.     As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 95 has suffered physical, emotional, psychological, and economic damages. He sometimes has flashbacks, which are stressful and cause anxiety. John Doe 95 becomes agitated when anyone

has an issue with him as a doctor or a community leader. He takes extra time when seeing patients well beyond the time colleagues take to see patients to ensure that patients trust John Doe 95, costing John Doe 95 significant economic harm. He relents to patients who have unfounded grievances because it is too stressful to lose their trust or be accused of any wrongdoing, costing John Doe 95 significant economic harm. John Doe 95 relents in bill disputes to ensure patient satisfaction, costing John Doe 95 significant economic harm. Despite being a physician himself, John Doe 95 is unable to trust physicians. He has not seen a primary care physician or internist since 1988, when he graduated from OSU. Despite John Doe 95 having a family history of colon cancer, ulcerative colitis and Crohn's disease, he refuses to have a colonoscopy or see a doctor. He has avoided all medical professionals and has only seen the eye doctor and had one visit to a neurologist. John Doe 95 has struggled with intimacy issues with his wife. John Doe 95 is unable to take off his shirt in public and is unable to allow even his own wife see him with his shirt off. He cannot change clothes, dress or undress in his bedroom unless he is alone. This inability to be exposed even minimally also prevents him from partaking in swimming, an activity that was a staple in his training as a college athlete and an activity he would love to participate in with his own children.

## JOHN DOE 96

703. John Doe 96 was an undergraduate student at OSU from 1985 to 1987 and a member of the OSU football team.

704. While a student at OSU, John Doe 96 was abused by Dr. Strauss during at least three physical exams and nine medical appointments. He was 18 years old at the time that he was first abused.

705. John Doe 96 was recruited to OSU to compete on its football team and received a full athletic scholarship for football. He relied on his scholarship to attend OSU. He competed on

the OSU football team from 1985 to 1987. He was required to undergo a physical exam with Dr. Strauss at least three times as part of his participation on the football team.

706.     The OSU football coaches told John Doe 96 that the physical exam was required in order for him to compete on the football team. An OSU employee, coaches/staff, and/or the Athletic Department scheduled John Doe 96's three physical exams and nine medical appointments with Dr. Strauss, which took place on OSU's campus.

707.     At the beginning of the first physical exam, Dr. Strauss told John Doe 96 to get completely undressed and sit at the edge of the exam table. John Doe 96 complied. John Doe 96 and Dr. Strauss were alone in the exam room.

708.     Dr. Strauss sat on a stool between John Doe 96's legs and lowered his face to John Doe 96's genital region. Dr. Strauss began fondling John Doe 96's genitals. He stroked, pulled, and stretched John Doe 96's penis and testicles for a prolonged period of time. Dr. Strauss stated that he was pulling his penis to make sure that there was no discharge. Dr. Strauss then told John Doe 96 to turn around. Dr. Strauss inspected John Doe 96's anus and inserted his finger in John Doe 96's anus for a prolonged period of time. Dr. Strauss told John Doe 96 that he was a handsome young man. He never talked to John Doe 96 about the exam or the results.

709.     To compete on the OSU football team, John Doe 96 was required to attend at two more pre-season physical exams with Dr. Strauss following the first-year physical exam. Each exam proceeded in the same manner. During both exams, Dr. Strauss fondled John Doe 96's penis and testicles for a prolonged period of time while John Doe 96 sat on the exam table naked. He also digitally penetrated John Doe 96's anus for a prolonged period of time. While Dr. Strauss wore gloves during the first exam, he never wore gloves again during any subsequent exam.

710.    John Doe 96 felt uncomfortable during these exams. He complained to OSU football coach Earle Bruce that Dr. Strauss' physicals went beyond what he had experienced in the past. Coach Bruce told John Doe 96 not to pursue his concerns. Coach Bruce told John Doe 96 that "That's just Strauss. Are you gay? Then how do you know that's what it is?" Coach Bruce cautioned John Doe 96 not to come forward because it would be his word against Strauss' word, it could ruin John Doe 96's reputation, and end up in some sort of arbitration with no good outcome.

711.    OSU fired Coach Bruce after the 1987 football season.

712.    Because Coach Bruce was the only one to even listen to John Doe 96's concerns about Strauss' exams (albeit by minimizing those concerns and dissuading him from pursuing them), John Doe 96 was very upset when Bruce was fired. John Doe 96 decided to quit school after OSU fired Bruce.

713.    On at least nine occasions from 1985 to 1987 before John Doe 96 dropped out, John Doe 96 needed medical attention for pneumonia or asthma. The OSU Athletic Department scheduled these nine monthly exams with Dr. Strauss. These nine exams proceeded in the same way as the physical examinations, except that Dr. Strauss would have John Doe 96 lie naked on the table while he fondled John Doe 96's penis and testicles for a prolonged period of time. Dr. Strauss would not wear gloves.

714.    John Doe 96's teammates would joke about Dr. Strauss, referring to him as "Mr. Squeez'em Nuts," and "Mr. Finger Probe," sometimes within earshot of OSU coaches.

715.    John Doe 96 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him. Given Coach Bruce's statements, he was also afraid of saying anything further about his

discomfort in case it caused him to lose his scholarship.

716.   While John Doe 96 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examination, John Doe 96 did not understand or believe that Dr. Strauss had sexually abused him.

717.   John Doe 96 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

718.   Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 96 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

719.   Even if, while John Doe 96 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

720.   In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 96 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

721.   If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 96 would not have been abused by Dr. Strauss.

722.   As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 96 has suffered physical, emotional, psychological, and economic damages. John Doe 96 feels a mix of fear, stress, anger, and anxiety when he thinks about Dr. Strauss and what happened to him and

how it has impacted his life. He struggled with the choice to leave OSU caused by Dr. Strauss when the only person that would even talk to him about the exams was fired. He struggled with his sexuality for years after leaving OSU. Due to internalized homophobia, John Doe 96 attempted to commit suicide by slitting his wrists because he feared he was gay as a result of Dr. Strauss' conduct. John Doe 96 also quit the Minnesota Vikings his first year with the team after he was required to have a physical examination. The exam was so traumatic in bringing back memories of his experience with Dr. Strauss, and the stress and anxiety the experience gave him, that it caused him to quit. He does not trust doctors. He has not seen a physician for any medical treatment since his physical with the Minnesota Vikings. He feared for his children when they were growing up and would not allow them to be in a room alone with a doctor.

## JOHN DOE 97

723.    John Doe 97 was an undergraduate student at OSU from 1982 to 1987 and a member of the OSU fencing team.

724.    While a student at OSU, John Doe 97 was abused by Dr. Strauss during at least three medical appointments. He was 20 years old at the time that he was first abused.

725.    During the winter of 1983-1984, John Doe 97 injured his back during fencing practice. An OSU fencing coach instructed John Doe 97 to schedule a medical appointment with Dr. Strauss to get a referral for physical therapy for his back injury.

726.    At the beginning of the exam, Dr. Strauss told John Doe 97 that he had to do a complete full body physical.

727.    Dr. Strauss told John Doe 97 to get completely undressed and sit at the edge of the exam table. John Doe 97 complied. John Doe 97 and Dr. Strauss were alone in the exam room, which was an exam room off of a training room in Larkins Hall.

728.    Dr. Strauss sat on a stool between John Doe 97's legs and lowered his face to

John Doe 97's genital region. Dr. Strauss began fondling John Doe 97's genitals. He stroked, pulled, and stretched John Doe 97's penis and testicles for a prolonged period of time. Dr. Strauss said that there was a herpes bump under the head of John Doe 97's penis that he had to work on. Dr. Strauss told John Doe 97 it would be easier to work on the penis if it was erect. John Doe 97 believed Dr. Strauss because he had great reverence for doctors. Dr. Strauss stroked John Doe 97's penis for many minutes until it was fully erect. Dr. Strauss then concluded the exam and told John Doe 97 that he would have to come back a couple times for further herpes treatment. Dr. Strauss did not wear gloves.

729.    John Doe 97 was required to attend two more physical exams with Dr. Strauss following the initial visit. During each exam stroked John Doe 97's penis for many minutes until it was fully erect and fondled his testicles while John Doe 97 sat on the exam table naked, telling John Doe 97 it was part of the treatment of his herpes. During the final exam, a wrestler entered the exam room without knocking. Upon entering, the wrestler looked surprised at seeing Dr. Strauss fondling John Doe 97's penis, and then backed out and closed the door. John Doe 97 was mortified that another student-athlete saw Dr. Strauss' hand on his genitals and his erect penis.

730.    John Doe 97 was terrified that the student who saw Dr. Strauss' treatment of him would say something to other student-athletes implying that John Doe 97 was gay, which would have devastating consequences in the social and health environment at the time.

731.    John Doe 97's teammates made jokes about visiting Dr. Strauss, often within earshot of the OSU fencing coaches.

732.    John Doe 97 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

733.    While John Doe 97 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss' examinations, John Doe 97 did not understand or believe that Dr. Strauss had sexually abused him.

734.    John Doe 97 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate.

735.    Until learning in 2018 about OSU's investigation into Dr. Strauss' conduct, John Doe 97 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other student-athletes had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

736.    Even if, while John Doe 97 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

737.    In short, until learning in 2018 about Dr. Strauss' serial sexual abuse of OSU students, John Doe 97 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

738.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 97 would not have been abused by Dr. Strauss.

739.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 97 has suffered physical, emotional, and psychological damages. John Doe 97 feels a mix of confusion, stress, anger, and anxiety when he thinks about Dr. Strauss and what happened to him and how it has impacted his life. He struggles with his identity and how he views himself. He questions how

he could go back a second and third time. He has questioned his sexuality and sexual orientation, causing him significant emotional distress. He feared his teammates thought he was gay in the midst of the AIDS pandemic. Dr. Strauss' abuse led him to view his father, a physician, differently because it caused him to wonder if that is what doctors do to people.

## JOHN DOE 98

740.    John Doe 98 was a student at OSU from 1995 through 2000, and a member of OSU's wrestling team from 1995 to 1999.

741.    John Doe 98 began seeing Dr. Strauss for medical appointments in 1995, including annual physicals. These physicals were required for OSU wrestlers. John Doe 98 was never given an option to see anyone other than Dr. Strauss, who was the physician assigned to the wrestling team.

742.    During the four years that he wrestled at OSU, John Doe 98 saw Dr. Strauss for approximately 15 to 20 exams. John Doe 98 and Dr. Strauss were alone for each exam. Dr. Strauss typically did not wear gloves during the exams.

743.    John Doe 98's first physical exam took place at the Woody Hayes facility. Every subsequent appointment with Dr. Strauss occurred in Dr. Strauss' office in Larkins Hall.

744.    John Doe 98's first physical with Dr. Strauss was in September 1995.

745.    During the physical exam, Dr. Strauss instructed John Doe 98 to drop his underwear. Dr. Strauss then sat on a stool while John Doe 98 stood, and brought his face very close to John Doe 98's genitals. Dr. Strauss began fondling John Doe 98's genitals for several minutes. Dr. Strauss' conduct caused John Doe 98 to have a partial erection.

746.    John Doe 98 had approximately 14 to 19 additional medical exams with Dr. Strauss from 1995 to 1998 for jock itch, a torn ligament in his finger, a broken hand, dislocated fingers, neck pain, strep throat, and at least one additional physical.

747.    At each exam, Dr. Strauss followed the same course of conduct. He told John Doe 98 various medical reasons he needed to examine John Doe 98's genitals regardless of the injury John Doe 98 presented. As one example, Dr. Strauss told John Doe 98 that he needed to examine the lymph nodes in John Doe 98's groin to see how they were affected by his strep throat. He then instructed John Doe 98 to disrobe and fondled John Doe 98's genitals for several minutes. His conduct sometimes caused John Doe 98's penis to become erect.

748.    During one appointment for jock itch in October 1995, Dr. Strauss also told John Doe 98 to get on the exam table and hold his knees to his chest. After fondling John Doe 98's genitals, Dr. Strauss inserted a finger into John Doe 98's anus and kept it there for a prolonged period.

749.    Dr. Strauss frequently was in the showers and locker rooms at Larkins Hall while John Doe 98 and his teammates were showering or changing. Dr. Strauss would stay in the showers for long periods of time. John Doe 98 often saw Dr. Strauss stroking his own genitals and soaping up his genitals for a prolonged period of time in the shower. Sometimes Dr. Strauss would get physically close to a student-athlete in the shower while stroking his own genitals.

750.    One morning, John Doe 98 went to Larkins Hall to shower after a workout. Dr. Strauss was in the shower area alone. When John Doe 98 came back to the locker room from the shower, he saw a note on the wrestling locker room door that said, "Hey do you want to get sucked?" He believes the note came from Dr. Strauss, as Dr. Strauss was the only other person he saw in the area at that time. John Doe 98 ignored the note.

751.    Dr. Strauss also frequently entered the Larkins Hall sauna fully nude. Sometimes he sat behind John Doe 98 such that his knee made contact with John Doe 98's back or elbow. Dr. Strauss often stroked his penis in the sauna, apparently masturbating, sometimes underneath

his towel and sometimes fully nude.

752. John Doe 98's wrestling teammates were aware of Dr. Strauss' conduct during medical exams. Because of Dr. Strauss' conduct, John Doe 98's wrestling teammates teased him and called him derogatory slurs like "fag" and "homo" whenever he had an appointment with Dr. Strauss. After his appointments, John Doe 98's teammates told him, "You must like that kind of stuff." Similarly, his wrestling teammates also called other teammates who had been examined by Dr. Strauss these same slurs.

753. The wrestlers referred to Dr. Strauss as Dr. Jelly Paws and Dr. Cough.

754. The wrestlers often discussed what Dr. Strauss did during examinations, including where he put his hands and how long he examined their genitals, often around coaches and trainers. The OSU staff made jokes about Dr. Strauss being weird and creepy. The OSU wrestling coaches and trainers treated Dr. Strauss's conduct as an accepted fact that they were powerless to stop; they intimated that the wrestlers should simply tolerate his behavior.

755. John Doe 98 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

756. While John Doe 98 was an OSU student, he trusted that OSU would not allow him to be harmed. OSU wrestling staff and student-athletes openly joked about Dr. Strauss' examinations, the wrestling coaches continued to require John Doe 98 and other athletes to see Dr. Strauss for examinations and treatment, and John Doe 98 reasonably believed that OSU would not have required him and other student-athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, although he felt uncomfortable during Dr. Strauss' examinations, John Doe 98 did not understand or believe that Dr. Strauss had sexually abused

him.

757.    Until learning about OSU's 2018 investigation into allegations that Dr. Strauss had sexually abused OSU student-athletes, John Doe 98 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive medical examinations of him or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

758.    Even if, while he was an OSU student, John Doe 98 had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

759.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 98 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

760.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 98 would not have been abused by Dr. Strauss.

761.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 98 has suffered physical and severe emotional, psychological, and financial damages. Dr. Strauss' abuse caused John Doe 98 to experience severe depression, which he self-treated with sex and pornography, ultimately developing a harmful sex addiction. John Doe 98 attends regular therapy to process Dr. Strauss' abuse and his own sex addiction.

762.    Since college, John Doe 98 has resisted seeing doctors or addressing health-related issues for any reason. He is afraid to be seen by medical professionals.

763.    After enduring Dr. Strauss' exams, John Doe 98 also lost his academic drive. John

Doe 98 had excelled academically in high school, but his experience with Dr. Strauss made him not want to attend school. He stopped attending class his junior and senior years of college, his GPA dropped, and he did not maintain his good academic standing. Ultimately, John Doe 98's failure to attend class prevented him from earning his degree. He was devastated by his failure to graduate, in part because he loved OSU as a school. John Doe 98 has tried to enroll in OSU's program for ex-athletes to return to finish their degrees, but OSU would not accept him because his GPA was too low for the program.

764.    After failing to obtain his degree, John Doe 98 obtained his undergraduate degree at another school, at substantial cost.

765.    John Doe 98's life has been devastated by the effects of Dr. Strauss' abuse. He is outraged and feels betrayed by OSU for allowing Dr. Strauss to continue to treat students, including himself, even after OSU had received complaints about Dr. Strauss' behavior.

## JOHN DOE 99

766.    John Doe 99 was a student at OSU from 1995 to 1996. He was a walk-on member of the OSU football team during that time.

767.    While a student at OSU, John Doe 99 was abused by Dr. Strauss during two exams. John Doe 99 and Dr. Strauss were the only individuals present for each exam.

768.    The summer before his enrollment at OSU on a full athletic scholarship, John Doe 99 was stabbed in the arm while being robbed. John Doe 99 was required to undergo surgery to regain some motion in his arm. John Doe 99 lost his athletic scholarship, but he still "walked on" to the OSU football team.

769.    As part of his participation on OSU's football team, John Doe 99 was directed to Dr. Strauss by OSU medical staff for an examination to determine John Doe 99's rehabilitation

needs. The examinations took place on the OSU campus.

770.    At the first exam, Dr. Strauss asked John Doe 99 to get fully undressed. John Doe 99 stood while Dr. Strauss sat in front of him and fondled John Doe 99's penis and testicles for a prolonged period of time, causing John Doe 99 to have an erection.

771.    Dr. Strauss instructed John Doe 99 to bend over the exam table. He felt around John Doe 99's anus and inserted a finger into John Doe 99's anus.

772.    John Doe 99 asked Dr. Strauss, "What does this have to do with my arm?" Dr. Strauss replied that he needed to check "everything" since it was his first exam of John Doe 99.

773.    Throughout the exam, Dr. Strauss commented on John Doe 99's muscles and repeatedly squeezed them.

774.    John Doe 99 felt embarrassed by what was happening.

775.    At John Doe 99's second exam with Dr. Strauss, Dr. Strauss again fondled John Doe 99's genitals for a prolonged period of time.

776.    When John Doe 99 began to have another erection, he felt so embarrassed and upset that he ended the appointment. John Doe 99 got dressed and walked out of the exam room.

777.    John Doe 99 was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

778.    While John Doe 99 was an OSU student, he trusted that OSU would not allow him to be harmed.

779.    John Doe 99 reasonably believed that OSU would not have made Dr. Strauss the athletic team doctor and required him and other athletes to see Dr. Strauss unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss'

examinations and treatments, John Doe 99 did not understand or believe that Dr. Strauss had sexually abused him.

780.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 99 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

781.    Even if, while John Doe 99 was an OSU student, he had tried to inquire further into OSU's role in Dr. Strauss' conduct, the inquiry would have been futile, as OSU controlled access to that information.

782.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial sexual abuse of OSU students, John Doe 99 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

783.    If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 99 would not have been abused by Dr. Strauss.

784.    As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 99 has suffered physical, emotional, psychological, and economic damages. Despite John Doe 99's desire to rehabilitate his arm function and play as a walk-on athlete for the OSU football team, he was so humiliated and ashamed by his experience with Dr. Strauss that he could not bring himself to go to any more medical or rehabilitation appointments. John Doe 99 withdrew from OSU a few weeks into his first semester there and moved to California. He did not re-enroll in any other college after his move. He did not attend any medical or rehabilitation appointments for years; John Doe 99's arm healed improperly as a result. John Doe 99 eventually began seeing

physicians again to receive treatment for his improperly healed arm. These additional appointments have been costly, time-consuming, and painful.

785.    After leaving OSU, John Doe 99 felt that he was nothing more than a disabled college dropout. He fell into a deep depression and attempted suicide shortly after moving to California. He attempted suicide twice more before beginning treatment with a psychiatrist in 2014. John Doe 99 is currently on anxiety and depression medication. He continues to have flashbacks to Dr. Strauss' examinations. John Doe 99 has also suffered severe emotional distress from his fear that he might be gay due to his body's reaction to Dr. Strauss' exam.

## JOHN DOE 100

786.    John Doe 100 was a student at OSU from 1988 to 1995.

787.    While a student at OSU, John Doe 100 was examined by Dr. Strauss on approximately eight to ten occasions between 1990 and 1994.

788.    For each visit, John Doe 100 scheduled an appointment through OSU's Student Health Center. He never specifically requested to be examined by Dr. Strauss. John Doe 100 was seen by Dr. Strauss seven or eight times for treatment and follow-up concerning STIs and at least two times for treatment of a hernia.

789.    At each appointment, John Doe 100 and Dr. Strauss were alone for the duration of the medical examinations.

790.    At each appointment, Dr. Strauss instructed John Doe 100 to completely undress. Dr. Strauss then fondled John Doe 100's penis, testicles, and scrotum for a prolonged period of time. John Doe 100 believes that Dr. Strauss was trying to cause John Doe 100 to get an erection. At each appointment, Dr. Strauss also examined John Doe 100's anus and rectal area for a prolonged period.

791.    During these medical exams, John Doe 100 felt embarrassed and uncomfortable

because of Dr. Strauss' conduct. At the time John Doe 100 did not realize that Dr. Strauss was sexually abusing and harassing him.

792.    While he was a student at OSU, John Doe 100 did not know what to do about Dr. Strauss' conduct. He was never informed or made aware of any OSU grievance procedure to complain about Dr. Strauss and did not believe there was any recourse for what happened to him.

793.    In retrospect, John Doe 100 realizes that Dr. Strauss sexually abused him. He did not know or have reason to know this until after he learned of OSU's 2018 investigation into allegations of abuse by Dr. Strauss.

794.    While John Doe 100 was an OSU student, he trusted that OSU would not allow him to be harmed. Thus, although he felt uncomfortable during Dr. Strauss' examinations, John Doe 100 did not understand or believe that Dr. Strauss had sexually abused him.

795.    John Doe 100 reasonably believed that OSU would not have made Dr. Strauss a university doctor unless Dr. Strauss' examinations were legitimate. So, even though he felt uncomfortable during Dr. Strauss' examinations and treatments, John Doe 100 did not understand or believe that Dr. Strauss had sexually abused him.

796.    Until learning about OSU's 2018 investigation into Dr. Strauss' conduct, John Doe 100 did not know, or have reason to know, of OSU's role in Dr. Strauss' sexually abusive conduct or that other students had previously complained to OSU about Dr. Strauss' abuse. Nor did he have reason to investigate whether OSU had harmed him.

797.    Even if, while he was an OSU student, John Doe 100 had tried to inquire into OSU's role in permitting Dr. Strauss' abuse of him, the inquiry would have been futile, as OSU controlled access to that information.

798.    In short, until learning about OSU's 2018 investigation into Dr. Strauss' serial

sexual abuse of OSU students, John Doe 100 did not know, or have reason to know, that Dr. Strauss had sexually abused him, that OSU had known about Dr. Strauss' serial sexual abuse, or that OSU had failed to take appropriate steps to stop Dr. Strauss' abuse.

799.     If OSU had taken meaningful action to address prior reports of Dr. Strauss' sexual abuse, John Doe 100 would not have been abused by Dr. Strauss.

800.     As a result of Dr. Strauss' abuse and OSU's failure to prevent it, John Doe 100 has suffered physical, emotional, and psychological damages. After the exams, John Doe 100 felt a lot of anger and anxiety, and he had trouble trusting people. He had recurring nightmares about the exams for over ten years after they happened. Dr. Strauss' abuse also impacted John Doe 100's educational performance, made him feel disconnected from school, and contributed to his feelings that nobody at OSU cared about him. John Doe 100 avoided receiving medical treatment on OSU's campus because he did not want to see Dr. Strauss, even when he had a serious cough that required medical treatment. John Doe 100 generally avoided doctors for several years following Dr. Strauss' "examinations." He also did not trust doctors to be alone with his children until they were older. In the years following John Doe 100's graduation from OSU, he has been diagnosed with anxiety and OCD. Since learning about the publicly reported 2018 investigation of Dr. Strauss' abuse and OSU's knowledge and failure to prevent it, John Doe 100 has been increasingly anxious and angry. He feels betrayed that OSU allowed Dr. Strauss to remain a treating physician on campus for years after knowing about Dr. Strauss' abuse.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Title IX, 20 U.S.C. § 1681(a), *et seq.*
### Creation of Sexually Hostile Culture/Heightened Risk of Sexual Harassment

801.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

802.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

803.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

804.    As explained in Title IX guidance issued by the United States Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

805.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

806.    Title IX covers all persons subjected to discrimination in any program or activity of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault and sexual abuse—by school employees, students, and third parties.

807.    Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

808.    Dr. Strauss was an OSU employee whose actions were carried out as an OSU professor, OSU athletic team doctor, and physician at OSU.

809.    Dr. Strauss' sexual harassment of Plaintiffs (and others)—which included, among other things, fondling their testicles and penises, masturbating men to erection and ejaculation,

drugging and anally raping them, digitally penetrating their rectums, touching their bodies in other inappropriate ways, making inappropriate comments about their bodies, and asking improper, sexualized questions—was sex discrimination under Title IX.

810. Dr. Strauss' sexual harassment of Plaintiffs (and others) was rampant, occurring regularly on campus and sometimes at his home, for two decades.

811. OSU had actual knowledge of Dr. Strauss' serial sexual harassment and permitted it to continue unchecked until 1996 and, even when OSU belatedly took action in 1996, it permitted him to remain employed through 1998, when OSU allowed Dr. Strauss to retire with emeritus status.

812. Throughout Dr. Strauss' 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Dr. Strauss' inappropriate conduct.

813. For decades, Strauss' abuse was well known among at least *fifty* OSU employees in the athletic department. Multiple Student Health Directors also had information about Dr. Strauss abuse for years.

814. Specifically, OSU was notified about Dr. Strauss' sexual harassment through OSU employees who had authority to take corrective action to address it. These OSU employees include, but are not limited to: former Director of Student Health Services, Ted Grace, M.D.; OSU Counsel Helen Ninos; Vice President of Student Affairs Mary Daniels; Vice President of Student Affairs David Williams; former Head Team Physician/Medical Director of the OSU Sports Medicine and Family Health Center Dr. John Lombardo; former Head Team Physician/Director of Sports Medicine Dr. Bob Murphy; former Athletic Director and Assistant University Vice President Andy Geiger; former Athletic Director Jim Jones; former Assistant

Athletic Director Archie Griffin; former Athletic Director Hugh Hindman; Senior Associate Athletic Director Paul Krebs; former Assistant Athletic Director Larry Romanoff; former Associate Sports Information Director Steve Snapp; former Assistant Athletic Director Richard Delaney; Assistant Director of Student Athlete Support Services John Macko; former Co-Head Athletic Trainer Billy Hill; former Head Wrestling Coach Russ Hellickson; former Head Tennis Coach John Daly; former Head Track and Field Coach Frank Zubovich; former Head Swimming Coach Dick Sloan; former Head Wrestling Coach Chris Ford; former Head Gymnastics Coach Peter Kormann; former Head Lacrosse Coach Paul Caldwell; former Head Cheerleading Coach Sherri Moore; former Head Football Coach Earle Bruce; and former Head Fencing Coach Charlotte Remenyik.

815.    Many coaches at OSU had enormous power and responsibility. For example, when asked in 2011 whether he would dismiss then-football coach Jim Tressel (for conduct unrelated to Dr. Strauss' abuse), the OSU president replied: "No, are you kidding? Let me just be very clear: I'm just hopeful the coach doesn't dismiss me."[49]

816.    OSU's knowledge of Dr. Strauss' sexual abuse is indisputable.

817.    Both the Perkins Coie Report and the Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss concluded that for years, starting in Dr. Strauss' first year of employment at OSU, OSU personnel—including Dr. Strauss' supervisors in Student Health and the Athletic Department—had knowledge of Dr. Strauss' sexual abuse of male students, based on reports made by students and OSU employees.

818.    OSU was required to promptly investigate and address Plaintiffs' (and others) allegations, reports and/or complaints of unwelcome, inappropriate touching and comments by

---

[49] *Gee: No Tressel dismissal*, The Columbus Dispatch (Mar. 8, 2011), https://www.youtube.com/watch?v=dCutRJvTK6c

Dr. Strauss, but OSU did not do so.

819.     After Snyder-Hill notified former Director of Student Health Services, Dr. Ted Grace, about Dr. Strauss' sexual abuse, Dr. Grace assured Snyder-Hill that OSU would document and retain any future complaints about Dr. Strauss. But OSU's personnel file on Dr. Strauss does not even mention Snyder-Hill's complaint. For his part, Dr. Grace took his files concerning Dr. Strauss' sexual abuse to his home, then shredded them years later.

820.     Despite years of complaints, OSU did not take any steps to stop Dr. Strauss from treating—and abusing—students until January 1996. At that point, OSU belatedly placed Dr. Strauss on administrative leave and launched an investigation—though the investigation did not include the history of complaints about Strauss in Athletics. OSU held a hearing in June 1996, without notifying the student complainants or permitting them to participate.

821.     Even after OSU's Athletics Department decided to terminate Dr. Strauss' employment and Student Health Services decided not renew his appointment, OSU permitted Dr. Strauss' faculty appointment as a tenured professor to continue, permitted him to retire, and granted him emeritus status when he retired. OSU also permitted Dr. Strauss to open an off-campus men's clinic while he was on administrative leave and under investigation and to advertise for patients in the school newspaper.

822.     OSU created and was deliberately indifferent to a sexually hostile culture within its education programs and activities, by, among other things:

>    a.    Mishandling students' reports about Dr. Strauss' conduct and/or discouraging students from reporting Dr. Strauss' conduct;
>
>    b.    Failing to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss' conduct;

c.   Promoting Dr. Strauss and increasing his access to OSU students, despite students' complaints about Dr. Strauss' conduct;

d.   Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

e.   Failing to take prompt and appropriate corrective action to prevent Dr. Strauss from sexually harassing other students;

f.   Requiring student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships—even after student-athletes complained to athletic directors, coaches, and trainers about the ways Dr. Strauss touched them during medical examinations.

g.   Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

h.   Joking about Dr. Strauss' conduct with student-athletes;

i.   Permitting Dr. Strauss to ogle male student-athletes at Larkins Hall while they showered;

j.   Permitting Dr. Strauss to shower with student-athletes for hours at a time, several times a day;

k.   Falsely representing to at least one student who reported sexual harassment by Dr. Strauss that there had been no prior complaints about Dr. Strauss and that Student Health had only received positive comments about Dr. Strauss;

l.   Permitting a toxic, sexualized culture to thrive at Larkins Hall, where a

cohort of older male "voyeurs" gathered to gawk at male student-athletes and masturbate while watching them shower.

m.     Conducting a cabined investigation into Dr. Strauss' abuse in 1996 that did not include determining the scope of his abuse and did not include examining his treatment of athletes;

n.     Failing to notify those who complained about Dr. Strauss' conduct about the June 1996 disciplinary hearing and not permitting the complainants an opportunity to testify at that hearing;

o.     Covering up the scope of the abuse of Dr. Strauss by not telling anyone outside OSU that it held a disciplinary hearing in June 1996 based on complaints of Dr. Strauss' abuse and OSU then declined to renew Strauss' appointment with Student Health and the Athletic Department terminated his employment agreement, thereby concealing from complainants and those who were victimized by Dr. Strauss the truth about Dr. Strauss' abuse and OSU's indifference for over two decades;

p.     Covering up and concealing the scope of the abuse of Dr. Strauss by destroying the health records of those who Dr. Strauss examined, even destroying documents *after* OSU launched an investigation into Dr. Strauss' abuse;

q.     Allowing Dr. Strauss to continue his employment as a tenured professor after OSU suspending him from seeing students at Student Health and in Athletics and granting him the honorific of emeritus status when he retired;

r.      Allowing Dr. Strauss continued access to students by approving his off-campus men's clinic and allowing him to advertise in the student newspaper;

s.      Failing to train its employees to prevent, investigate, or report the sexual abuse of students;

t.      Failing to have a policy of investigating or reporting staff who sexually abused students;

u.      Failing to notify the Medical Board of Ohio about Dr. Strauss' abuse; and

v.      Failing to notify law enforcement about Dr. Strauss' abuse.

823.    OSU's creation of and deliberate indifference to the sexually hostile culture within its education programs and activities substantially increased the risk that Plaintiffs and others would be sexually harassed and abused.

824.    The sexual harassment and abuse that Plaintiffs suffered was so severe, pervasive, and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

825.    As a direct and proximate result of OSU's creation of and deliberate indifference to a sexually hostile educational environment, which violated Title IX, Plaintiffs have suffered and continue to suffer damages and injuries.

## COUNT II
### Violation of Title IX, 20 U.S.C. § 1681(a), *et seq.*
### Deliberate Indifference to Prior Sexual Harassment

826.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

827.    Before Dr. Strauss sexually harassed or abused most, if not all, of the Plaintiffs, OSU had actual knowledge of Dr. Strauss' prior sexual harassment and abuse of male students at

OSU.

828.     "University personnel had knowledge of Strauss' sexual abusive treatment of male student-patients as early as 1979," within Dr. Strauss' first year at OSU. Report at 1. "As early as 1979, personnel in the University's Sports Medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present." *Id.* at 2.

829.     Strauss' inappropriate sexual behavior was "broadly witnessed and discussed in the Athletics Department"; "[m]ore than *50* individuals who were members of the OSU Athletics Department staff" knew about Dr. Strauss' inappropriate sexual conduct. *Id.* at 88 (emphasis added). "[B]eing examined by Strauss was akin to being 'hazed' or was a 'rite of passage.'" *Id.*

830.     Between 1978 and 1996, numerous student-athletes complained to OSU administrators and staff about Dr. Strauss' inappropriate conduct.

831.     Based on Dr. Strauss' prior conduct, OSU had actual knowledge of the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

832.     OSU officials, with the knowledge described above, had the authority to address the risk posed by Dr. Strauss, and had the authority to take corrective measures by, among other things, closely supervising Dr. Strauss, not allowing him to examine to examine students without another medical professional present, not allowing him to shower with student-athletes, or terminating his employment.

833.     OSU's failure to address the substantial risk posed by Dr. Strauss, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

834. By its acts and omissions, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

835. As a result of OSU's deliberate indifference, Plaintiffs were subjected to severe sexual harassment by Dr. Strauss, including sexual assault in the guise of medical care.

836. The sexual harassment that Plaintiffs suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

837. As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss' prior sexual harassment of male students at OSU, which violated Title IX, Plaintiffs have suffered and continue to suffer damages and injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment in favor of Plaintiffs on their discrimination claims under Title IX;

(b) Enter judgment against Defendant The Ohio State University;

(c) Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(d) Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish,

loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(e)     Award Plaintiffs pre-judgment and post-judgment interest;

(f)     Award Plaintiffs their court costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b); and

(g)     Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in this Complaint.

Date: June 28, 2021

Respectfully submitted,

By:  /s/ Scott E. Smith
Scott. E. Smith (0003749)
Michael L. Dillard (0083907)
SCOTT ELLIOT SMITH, LPA
5003 Horizons Drive, Suite 100
Columbus, Ohio 43220
Phone: 614.846.1700
Fax:     614.486.4987
E-Mail: ses@sestriallaw.com

Ilann M. Maazel*
Debra L. Greenberger*
Marissa R. Benavides*
EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
600 Fifth Avenue
New York, New York 10020
Phone: (212) 763-5000
Fax: (212) 763-5001
E-Mail: imaazel@ecbalaw.com
E-Mail: dgreenberger@ecbalaw.com
E-Mail: mbenavides@ecbalaw.com

Adele P. Kimmel*
Alexandra Brodsky*
PUBLIC JUSTICE, P.C.
1620 L Street, NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
Fax: (202) 232-7203
E-Mail: akimmel@publicjustice.net
E-Mail: abrodsky@publicjustice.net

* *Pro hac vice* application to be submitted

*Attorneys for Plaintiffs*

144